Richmond

## WILLIAM P. NEWCOMER

v.

## COMMONWEALTH OF VIRGINIA

June 8, 1979.

Record No. 781233.

Present: All the Justices.

*Bernard J. Natkin; Shuler A. Kizer (Ganas and Natkin,* on brief), for appellant.

*Todd E. LePage, Assistant Attorney General (Marshall Coleman, Attorney General,* on brief), for appellee.

HARRISON, J., delivered the opinion of the Court.

William P. Newcomer was indicted in the Circuit Court of the City of Buena Vista for the murder of Vernon Staton. The defendant was tried twice in Buena Vista, and both trials resulted in hung juries. Following the second trial a motion by the Commonwealth for change of venue was granted. Thereafter defendant was tried by a jury in the Circuit Court of Rockbridge County, convicted of second degree murder and sentenced to confinement in the state penitentiary for a period of seven years.

Newcomer's assignments of error allege that a change of venue was improperly ordered; that the Commonwealth suppressed exculpatory evidence favorable to defendant; that certain instructions were erroneously given; and that the jury was improperly

instructed to disregard a portion of the closing argument made by Newcomer's counsel.

Although all the testimony is not set out in the record filed on appeal, it appears that Newcomer and Staton had experienced difficulties for several weeks prior to the shooting. The friction between the two men stemmed from Staton's suspicions that Newcomer was seeing Staton's estranged wife. Because of threats made by the decedent, Newcomer had consulted the Buena Vista Commonwealth's Attorney and a Staunton law firm as to what action he should take to protect himself.

During the early morning hours of July 24, 1976, the situation turned violent. An all-night card game, attended by a number of individuals including the defendant, had been held in the Buena Vista home of Ham Henson. Early in the evening, and prior to the defendant's arrival at the Henson home, Staton had come there looking for Newcomer. Staton returned about 6 a.m., at which time he entered the Henson house when Newcomer would not come outside and talk with him. Staton swung at the defendant, precipitating a fight during which the defendant slipped to the floor and, while lying there, was kicked in the face by Staton. The struggle continued and the defendant again fell to the floor. Staton stepped over Newcomer and "told him to be out of town by Monday". Staton then left the house, apparently with the intention of driving away.

Lewis E. Plaugher, Investigator for the Buena Vista Police Department, testified that the defendant said that when he regained his senses, he got a pistol off the table and went outside; that by this time Staton was almost across the street; and that when Staton realized that defendant had a gun, he turned, started back and began apologizing. The defendant stated that he then told Staton "[t]his is it", and started shooting.

Testimony revealed that the defendant began firing while the victim was dodging back and forth behind a tree. According to Ralph Harrison, an eyewitness, after the shooting began Staton fell to his knees, threw his hands into the air and begged the defendant not to shoot anymore. Staton then tried to run but fell in the street when he was shot again. The defendant then walked over to Staton and shot him, for what proved to be the seventh time, while Staton was lying face up.

Further testimony at trial established that the defendant, when asked by Officer Plaugher whether he really meant to kill Staton, replied "[t]hat's the reason I shot him." William E. Ferris and Ronnie Slough, members of the Buena Vista Rescue Squad, stated that shortly after the homicide Newcomer told them Staton had been shot, adding "I hope the son of a b.... is dead." Finally, Ralph Harrison further testified that he talked with the defendant on the day after the homicide. He said when he remarked that Newcomer could have hit one of the other men present, the defendant replied: "No, I looked around and saw everybody but George Saunders before I started shooting."

In support of the motion for a change of venue, the Commonwealth introduced the testimony of W. T. Robey, III, a long-time resident of Buena Vista, who was then its Commonwealth's Attorney and City Attorney. Besides Robey's testimony the trial court considered an editorial published by the Buena Vista News following the second mistrial. This editorial was in addition to news articles which had been submitted in support of a prior motion by the Commonwealth for change of venue, made after the first trial. In opposition to the Commonwealth's motion, the defendant introduced an affidavit signed by eleven persons, stating that both the Commonwealth and the defendant could get a fair trial in Buena Vista.

██ It is well settled in Virginia that a change of venue is a matter within the sound discretion of the trial judge, and it is only where the record affirmatively shows an abuse of that discretion will a trial court's ruling be reversed. *Poindexter* v. *Commonwealth*, 218 Va. 314, 237 S.E.2d 139 (1977); *Looney's Case*, 115 Va. 921, 78 S.E. 625 (1913). The right to change of venue is conferred by Code § 19.2-251, and its purpose is to accord litigants, both the Commonwealth and the defendant, a fair and impartial trial. The statute is liberally construed in the furtherance of justice and to the end that the right to a fair trial be not denied. *Ramsay* v. *Harrison*, 119 Va. 682, 89 S.E. 977 (1916).

██ The position of the Commonwealth is that there was such a polarization of opinion in Buena Vista regarding the defendant's guilt or innocence, brought about as the result of extraneous matters, that a fair trial of the defendant could not be had. Buena Vista is a small city with an estimated population of 7,000. The victim and the defendant were apparently well known, and the circumstances that precipitated the homicide and the setting in

which it occurred were such that a great deal of notoriety was generated.[1] The case and its trials were the subject of extensive media coverage and editorial comment. Robey testified that he heard many people speak about the incident, and that their discussions involved matters irrelevant to the actual issues in the case as well as expressions of opinion as to what the outcome of the case should be. Robey thought that a fair trial could be had if the jurors put everything they knew out of their minds and considered only the evidence they heard during the trial, but added that he did not think this was possible. It appears from a reading of Robey's testimony that he felt that the defendant, rather than the Commonwealth, would be unable to get a fair and impartial trial in Buena Vista.

The editorial which appeared in the Buena Vista News recited that the editor had "never heard of trying one person for the same offense three times", and that the editor "resent[ed] outside lawyers". The editorial expressed strong opposition to moving a third trial outside Buena Vista, observing that such action amounted to "tell[ing] all of our people that they are unable to give a fair trial on this or any future trials. It would be an insult, to the honesty of our people".

The evidence in the instant case relied upon by the Commonwealth to support its motion for change of venue can be described as minimal. It consisted of a newspaper editorial, several newspaper articles and the testimony of one witness. While the editorial expressed displeasure over the prospect of a change of venue in the third trial of the *Newcomer* case, no antagonism toward the defendant was shown. In fact, the editorial expressly stated: "We know nothing of the innocence or guilt of the accused, and we do not here attempt to infer that the defendant is either innocent or guilty. We are not concerned with that aspect of the case. Our judicial system will take care of that." The only witness, the Commonwealth's Attorney of Buena Vista, was prevented from prosecuting the case by his association with one of the principals involved in the homicide and was disqualified on motion of counsel for Newcomer. His evidence was not buttressed by the testimony of any other witness or by affidavits.

---

[1] This notoriety is reflected in the trial court's comment that in the two previous trials, "each prospective juror knew about the case through the news media or personal observation or other sources".

For comparative purposes we examine the most recent cases decided by this Court involving change of venue. In *Poindexter* v. *Commonwealth*, 218 Va. 314, 237 S.E.2d 139 (1977), the defendant was charged with killing the district judge of Louisa County. The incident occurred under bizarre circumstances and generated an enormous amount of publicity. Following a mistrial the trial court granted the Commonwealth's motion for change of venue, a decision we affirmed on appeal. Unlike the present case, there the Commonwealth introduced thirteen affidavits from a diverse group of persons who worked and resided throughout Louisa County. The affidavits dealt with the influence of the Poindexter family, the feelings in the community for the deceased judge, and the polarization of public opinion on the issue of the defendant's guilt or innocence as well as his sanity or insanity. In addition, the Commonwealth introduced as an exhibit an 80-page scrapbook of pictures, stories and editorials published in four newspapers which were generally circulated and read by the citizens of Louisa County. These accounts gave in great detail the evidence in previous trials, including conflicting psychiatric evidence relating to defendant's mental state, as well as statements by jury members. Significantly, the defendant produced no evidence and filed no counter affidavits to those filed by the Commonwealth.

*Greenfield* v. *Commonwealth*, 214 Va. 710, 204 S.E.2d 414 (1974), involved the murder of a college student by a 17-year-old defendant of a different race. The defendant sought a change in venue, alleging that intensive press coverage prevented him from receiving a fair trial. There we observed that "[t]he burden was on the defendant to demonstrate by affirmative evidence that he could not obtain a fair trial in Charlottesville". We noted that the newspaper articles introduced into the record were fairly accurate and temperate accounts of a matter of public interest and observed that "[t]he absence of outrageous press behavior distinguishes the present case from *Sheppard* v. *Maxwell*, 384 U.S. 333 (1966); *Estes* v. *Texas*, 381 U.S. 532 (1965); *Rideau* v. *Louisiana*, 373 U.S. 723 (1963); *Irvin* v. *Dowd*, 366 U.S. 717 (1961)." We also noted in *Greenfield* that there was a substantial time difference from the date of the crime, November 19, 1972, when most of the press accounts appeared, and the date of the trial, June 13, 1973. On a change of venue motion courts must look to the conditions at the time of the trial, not to the conditions at the time of the crime. In the instant case the homicide allegedly committed by the defendant Newcomer occurred on July 24, 1976. The order of the

lower court changing venue from Buena Vista to Rockbridge County was entered on January 23, 1978.

We affirmed the action of the trial court in denying a change of venue in *Greenfield* because the record did not affirmatively show that the trial judge abused his discretion in holding that there was no reasonable likelihood that the defendant would be prejudiced in his trial before a Charlottesville jury. While almost all the prospective jurors had heard about the case, few of them remembered the details.

In *Rees v. Commonwealth,* 203 Va. 850, 127 S.E.2d 406 (1962), the defendant moved for a change of venue, supporting his motion with one affidavit and the testimony of five witnesses. The affidavit was given by the publisher of a Fredericksburg newspaper. No claim was made by the defendant, and no evidence was introduced, that the numerous articles in the newspaper were inflammatory, prejudiced or biased against the defendant. While the *Rees* case attracted great interest throughout Virginia, we held that there was no evidence that the news articles were anything other than factual news accounts and that this was insufficient to warrant a change of venue. The evidence of the defendant's witnesses was that an undisclosed number of people in the county were of opinion that the defendant was guilty and that this opinion was based primarily upon what they had read in the newspapers or heard on the radio. However, there was no evidence introduced of mass prejudice against the defendant, of mob action or threat of such action. The Commonwealth introduced the evidence of three witnesses to the effect that the defendant could receive a fair and impartial trial in the county and advised the court that it had summoned 32 additional witnesses who were present and ready to testify.

*Hampton v. Commonwealth,* 190 Va. 531, 58 S.E.2d 288, *cert. denied,* 339 U.S. 989 (1950), was a sensational trial, involving the rape of a young woman by a gang of men. The defendants' motion for change of venue was supported by nine affidavits and ten exhibits consisting of news articles published in a local newspaper. The Commonwealth filed 114 affidavits in which each affiant stated that he had heard the case discussed at various times,'but "no mass feeling had been aroused against defendants" and that they could obtain a fair and impartial trial without a change of venue. In addition, the court heard the testimony of 25 witnesses which concerned the published accounts of the crime and the

attitude generally of the people in the community regarding the case and the defendants.

In *Hampton* we quoted with approval from 56 Am. Jur. *Venue* § 68, p. 68, as follows:

> Under the rule in most jurisdictions an application for a change of venue in a criminal case on the ground of local prejudice rendering impossible an impartial trial is a matter addressed to the sound discretion of the court, and it is the consensus of opinion that the law presumes that a defendant can get a fair and impartial trial in the county in which the offense was committed; in order to overcome this presumption the burden is upon the defendant to show clearly that he cannot have such a fair and impartial trial. Before a court is justified in sustaining an application therefor on account of the prejudice of the inhabitants of the county it must affirmatively appear that there is such a feeling of prejudice prevailing in the community as will be reasonably certain to prevent a fair and impartial trial.

190 Va. at 545, 58 S.E.2d at 293.

In *Wansley v. Commonwealth*, 210 Va. 462, 171 S.E.2d 678, *cert. denied*, 399 U.S. 931 (1970), the defendant was found guilty of rape and robbery following his third trial, and two life sentences were imposed. Wansley claimed that the court erred in failing to grant a change of venue and pointed to the extensive coverage of the cases in the Lynchburg News and the Lynchburg Daily Advance.[2] The trial court overruled the defendant's motion for change of venue, and our opinion noted that of the 59 prospective jurors who were examined for the Wansley trial, 38 were stricken for cause, eight were stricken peremptorily, 12 were impaneled as jurors and one was accepted as an alternate juror. There we said that the issue

---

[2]The news accounts not only referred to the defendant's confession of guilt and to his reenactment of the crime, but also commented on the fact that defendant's counsel, William M. Kunstler, was a member of the National Lawyers Guild. The articles pointed out that a Danville newspaper had printed a story stating that the Lawyers Guild had been cited by the House Committee on Un-American Activities and that it had been listed three times by Congressional committees as a "Communist transmission belt".

was not whether the articles in the newspaper relating to Wansley and his attorney were irresponsible, but whether such articles prevented Wansley from receiving a fair trial at the hands of jurors. Wansley contended that the court should hold as a matter of law that he did not receive a fair trial because of the "inherent probability of prejudice in any jury drawn from the Lynchburg community". We declined to do so upon the ground that to so hold would have required us to ignore the *voir dire* examination.

*Newberry* v. *Commonwealth,* 192 Va. 819, 66 S.E.2d 841 (1951), illustrates the length to which some courts have gone to assure a defendant a trial by an impartial jury of his vicinage. There the court granted a change of venire only after unsuccessful efforts were made for nearly a year to secure an impartial jury in Bland County. More than 148 persons were summoned and examined on six separate writs of *venire facias.*

In the instant case we find the conclusion inescapable that the Commonwealth failed to demonstrate by affirmative evidence that either it or the defendant could not obtain a fair trial in Buena Vista. Aside from the news items and the editorial in the local paper, none of which was prejudicial to the defendant or his victim, the only other evidence supporting the motion for a change of venue was the testimony of Mr. Robey. While this witness was unquestionably sincere in his belief that there had been a polarization of sentiment in Buena Vista regarding the Newcomer case, we find few facts in his testimony which support that conclusion. Further, Mr. Robey, because of his former association with those involved in the homicide, cannot be regarded as a completely disinterested witness.[3] In essence the prosecution has failed to support its motion for a change of venue with sufficient evidence. It did not overcome the presumption that Newcomer could get a fair trial in Buena Vista.

---

[3] In Newcomer's third trial in Rockbridge County, Mr. Robey was called as a witness by and on behalf of the defendant Newcomer. He testified that he had known Newcomer for 15 years and that his reputation for being a peaceful and law-abiding citizen was good; that he had known Staton over a long period of years and had been a high school football co-captain with him; that Staton had the reputation of being a man "you did not cross or fool with or, like in this situation, he was a man whose wife you did not go with. If you went with his wife he was going to hurt you"; that Newcomer consulted with him prior to the homicide regarding the difficulty he was having with Staton, and that he (Robey) also discussed the matter with Staton. Mr. Robey further testified that at the time the homicide occurred he was representing Vernon Staton in a divorce action brought by his wife, Louise Staton, which action was then pending.

■ It is unnecessary for us to consider defendant's other assignments of error. However, we do observe that in any instruction where a jury is told that the law of self-defense is the law of necessity, it should also be told that in determining necessity "[a] defendant may always act upon reasonable appearance of danger, and whether the danger is reasonably apparent is always to be determined from the viewpoint of the defendant at the time he acted". *McGhee* v. *Commonwealth*, 219 Va. 560, 562, 248 S.E.2d 808, 810 (1978).

The verdict of the jury convicting the defendant of second degree murder is set aside, and the judgment of the trial court is reversed and vacated. This case is remanded to the Circuit Court of the City of Buena Vista for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*