## Richmond

### James Dyral Briley

### v.

### Commonwealth of Virginia

November 26, 1980.

Record No. 800904.

Present: All the Justices.

*Halford I. Hayes* (*Richard A. Turner; Hayes & Smith, P.C., on brief*), for appellant.

*Robert E. Bradenham, II, Assistant Attorney General* (*Marshall Coleman, Attorney General,* on brief), for appellee.

HARRISON, J., delivered the opinion of the Court.

A jury convicted James Dyral Briley of the capital murder of Harvey Wayne Barton during the commission of an armed robbery; of the capital murder of Judy Diane Barton during the commission of or following rape; of the first degree murder of Harvey W. Wilkerson; of the robbery of Harvey W. Wilkerson; of the rape of Judy Diane Barton; and of the use of a firearm during the commission of each of the foregoing crimes. In the penalty stage of the bifurcated proceeding, the jury recommended that Briley's punishment be fixed at death in each of the capital murder cases. Following the receipt of a post-conviction report of a probation officer, the trial court held a sentencing hearing and confirmed the jury's verdict in each case. The defendant sought and is entitled as a matter of right to this appellate review of his death sentences, and it, along with the appeal of all his convictions, has been given priority on our docket.[1] The defendant requests, alternatively, that we reverse his convictions and dismiss all indictments returned against him, or grant him a new trial, or grant him a new trial as to punishment, or commute his death sentences to life imprisonment.

The murders involved occurred in the City of Richmond at 2301 Barton Avenue in the home of Harvey W. Wilkerson on the evening of October 19, 1979. Two days later the bodies of Wilkerson, his "common-law" wife, Judy Diane Barton, and their five-year-old son, Harvey Wayne Barton, were found. Wilkerson and Mrs. Barton had been bound and gagged. The woman had been raped and shot four times. The man and boy had been shot once each. All died from the gunshot wounds.

The Commonwealth relies primarily on the testimony of Duncan Eric Meekins, a sixteen-year-old youth, who admitted that he murdered Wilkerson and was present during the commission of the various offenses of which the defendant stands convicted. Meekins' testimony was verified in part by the testimony of police officers who had the defendant, his brothers, and Meekins under surveillance at the time of the commission of the crimes. After Meekins' arrest and confession

---

[1] Code § 18.2-31 defines the offenses which constitute capital murder, they being inclusive of (d) the willful, deliberate, and premeditated killing of any person in the commission of robbery while armed with a deadly weapon, and (e) the willful, deliberate, and premeditated killing of a person during the commission of, or subsequent to, rape. The bifurcated proceeding which resulted in the two convictions of defendant for capital murder and the jury's recommendation of death were conducted pursuant to Code §§ 19.2-264.3 and -264.4. The sentencing hearing conducted by the court was in accordance with Code § 19.2-264.5. The defendant's automatic review of his death sentences is provided for by Code §§ 17-110.1(A) and -110.2.

he entered into a plea agreement with the prosecution by which he would receive a life sentence for the first degree murder of Wilkerson and sentences for other offenses committed by him not exceeding the punishment given any other participant in the crimes.

The Commonwealth established that on the evening of October 19, 1979, the defendant James Briley, his two brothers, Linwood and Anthony, and Meekins assembled at the Briley home at 3117 Fourth Avenue, and while drinking alcohol and smoking marijuana made plans to rob Harvey W. Wilkerson, whose home was a short distance from the Briley residence. When the four men left the Briley home in a car driven by Linwood they were armed with a shotgun, which was then in the possession of James, and a .22 caliber pistol, which was then in the possession of Linwood. Upon arriving in the area of the Wilkerson home, they went into a shed opposite the Wilkerson home and awaited the departure of some people they observed in front of that residence. James and Linwood entered the residence first, followed shortly thereafter by Anthony and Meekins. Meekins testified that when he and Anthony entered, Wilkerson and Judy Barton had already been bound with electrical tape around their arms and legs and had been gagged and placed on the floor. Their five-year-old child was lying on the floor but had not been bound. Meekins said that while Anthony and James searched the upstairs he [Meekins] saw Linwood Briley drag Mrs. Barton into the adjacent kitchen. He said that at the time Mrs. Barton's pants had been pulled down but he did not actually watch the rape by Linwood. Meekins admitted that after Linwood left the kitchen he went in and raped Mrs. Barton. He said that after he had completed the act, the defendant James entered the kitchen, got down on one knee and began to unzip his pants. Meekins, who was then otherwise occupied, did not actually see the defendant rape Mrs. Barton. After James left the kitchen, Linwood dragged Mrs. Barton back into the room where her husband and son had been kept and guarded during the series of rapes to which she was subjected.

Meekins further testified that while the four were in the Wilkerson home, Linwood gave him a .38 caliber silver derringer which Linwood said that he had taken from Wilkerson, and gave James the .22 caliber pistol which the parties had brought with them from the Briley home. James then gave Linwood the shotgun with which James had been armed throughout the entire episode. Meekins said that soon thereafter Linwood left the house to start the automobile. An officer watching the house testified that Linwood had a paper bag when he

left the house. Meekins said at that time both Wilkerson and his wife had been covered with sheets; that while he was looking through a peephole in the front door he heard a shot; and that he turned, saw the defendant standing over Mrs. Barton and saw blood on the sheet near her head. He said James had a pillow in his hand and that the defendant then told him [Meekins]: "You got to get one." Meekins said that he picked up a pillow, covered Wilkerson's head, and fired the derringer into the pillow. Meekins said that he then dropped the pistol, picked up a .22 rifle near the door and ran out into the street. He said he heard more shots and that then James and Anthony ran out behind him. During cross-examination by counsel for defendant regarding certain discrepancies in his testimony and pretrial statements, Meekins admitted that he was present when two other shots were fired and that he saw defendant shoot the child.

Officers who had the parties under surveillance, but were unaware of the crimes that were in progress, corroborated Meekins' testimony in many particulars as to the dress, size, and movements of the four men. They also corroborated Meekins' testimony that Anthony Briley carried a large shopping bag from the Wilkerson home, that James Briley was seen putting a pistol into his pants, and that Meekins was carrying a .22 rifle when he left the house.

James and his confederates left the scene in a car driven by Linwood. The car was equipped with a police scanner from which the occupants learned that the police were following them. The defendant and his companions stopped the car on Hazelhurst Avenue where Meekins attempted to hide the .22 rifle that he had brought from the Wilkerson home. Linwood dropped the shotgun brought from the Briley home over a nearby fence. The shotgun, the rifle, and a pistol holster were subsequently found and turned over to the police by area residents. The men finally abandoned the car after discovering the police were watching them with a "scope." Meekins said the money they had obtained, and which was in the possession of Linwood and James, was divided later that evening at the Briley home. Meekins received approximately $100.

The shotgun, .22 rifle, and holster found in the vicinity of Hazelhurst Avenue were introduced into evidence and identified by Meekins. Meekins recognized the holster as being in the Briley car on the night of the killings. The bullet found in Harvey Wilkerson's body was determined to be .38 caliber. The unmultilated bullets found in Judy Barton's body, a bullet found in the couch where the child's body was found, and bullet casings found on the apartment floor were all identi-

fied as .22 caliber. The Commonwealth's forensic expert stated that neither the .38 bullet nor the .22 bullets and casings could have been fired from the .22 rifle found on Hazelhurst Avenue. The .22 pistol and .38 derringer pistol used by defendant and Meekins in the killings were not recovered by the police.

The defendant did not testify. The testimony he introduced was designed primarily to discredit the testimony of Meekins. At the penalty hearing the Commonwealth showed that James Briley had been convicted in 1973 of armed robbery and attempted murder and that on the morning of the day of the Barton Avenue murders he had met with a Richmond judge to discuss the conditions of his parole.

The defendant has raised four major issues on this appeal which he argues merit a reversal.

## I. CHANGE OF VENUE OR VENIRE

Defendant claims that the lower court erred in denying his motion for a change of venue or, in the alternative, a change of venire. In support of his motion the defendant filed a notebook containing over seventy articles from three Richmond newspapers, which he says unduly emphasized his criminal record and his connection with other crimes allegedly committed by him, his brothers, and Meekins. This same notebook had been introduced in evidence at the trial of Linwood Briley growing out of the Barton Avenue murders.[2] Also filed were sixteen affidavits in which the affiants stated that they did not believe the defendant could get a fair trial in Richmond or in an adjacent county. A transcript of a change of venue hearing held in Linwood Briley's prosecution was also filed. Eight witnesses representing three Richmond newspapers and three area television stations testified and described the local coverage of the crimes involved.

The defendant relies on the cases of *Newcomer* v. *Commonwealth,* 220 Va. 64, 255 S.E.2d 485 (1979), and *Poindexter* v. *Commonwealth,* 218 Va. 314, 237 S.E.2d 139 (1977). In *Newcomer,* where we reversed a lower court for its action in granting a motion of the Commonwealth for change of venue, we observed that the Commonwealth had only put on one witness and had not tendered any affidavits in support of the motion. In *Poindexter* we affirmed the lower court's

---

[2] Linwood Briley has filed a petition for writ of error wherein he seeks reversal of his convictions of the first degree murder of Harvey Wayne Barton, Judy Diane Barton, and Harvey W. Wilkerson, the rape of Judy Diane Barton, the robbery of Harvey W. Wilkerson, and the use of a firearm during the commission of each of the five foregoing crimes.

granting of the Commonwealth's motion for a change of venue, and noted the Commonwealth's filing of thirteen supporting affidavits and a notebook showing the extensive media coverage. We also noted the failure of the defense to offer any counter affidavits in rebuttal. Defendant's reliance on these particular facts in *Newcomer* and *Poindexter* is misplaced. The decision whether to allow a change of venue or change in venire is a matter within the sound discretion of the trial court, and only where the record affirmatively shows an abuse of that discretion will its action be reversed. *Greenfield* v. *Commonwealth,* 214 Va. 710, 716, 204 S.E.2d 414, 419 (1974). Although in *Poindexter* we stated that affidavits unchallenged by counter affidavits or other evidence "should be taken to prove what is within them," 218 Va. at 319, 237 S.E.2d at 142, that statement is merely a guide to the trial judge in exercising his discretion after examining all the evidence.

"[T]he law presumes that a defendant can get a fair and impartial trial in the county in which the offense was committed. . . ." *Hampton* v. *Commonwealth,* 190 Va. 531, 545, 58 S.E.2d 288, 293, *cert. denied,* 339 U.S. 989 (1950). In *Newcomer,* we found the evidence of the Commonwealth clearly insufficient to rebut that presumption and held that it was error for the court to grant a change in venue. We cannot say that a finding here that the defendant had not overcome the presumption that he could receive a fair trial in Richmond, amounted to an abuse of the court's discretion. Indeed, the voir dire examination indicates otherwise. It was necessary to examine only forty-six individuals of fifty-two summonsed to obtain a jury panel and alternates. Twelve were initially excused because obvious grounds existed for exclusion, *i.e.,* knew victims, death penalty objections, relatives victims of a recent crime, legal confusion, bad hearing, and medical reasons. Four were excused because of personal reasons. Of the thirty remaining, twenty-six had read or heard something in the media about the instant case or that of Linwood Briley. Many of the prospective jurors, however, remembered little if anything about the details of either case. Of those twenty-six, only nine had discussed the case with anyone or had heard another discuss it. Only seven potential jurors had formed any opinion as to guilt. These seven were struck for cause. All jurors excepted to by the defense or by the Commonwealth were excused by the court. Little effort was made by the Commonwealth to rehabilitate any juror who was questionable because of responses made to questions by the court or counsel. The court generally excused such an individual before any objection was made or the person was struck on joint motion of defense and Commonwealth. A re-

view of the voir dire examination supports the lower court's determination. *Cf. Justus* v. *Commonwealth,* 220 Va. 971, 266 S.E.2d 87 (1980); *Wansley* v. *Commonwealth,* 210 Va. 462, 171 S.E.2d 678, *cert. denied,* 399 U.S. 931 (1970).

For obvious reasons the media coverage in Richmond was extensive. However, an examination of the various news items discloses that the reporting was factual and not of an inflammatory character. In determining whether a defendant has been prejudiced by pretrial media coverage, a court must look not only to the volume of the coverage, but to its content, tenor, and tone. The defense makes no claim that the news accounts were inaccurate or prepared and delivered in an inflammatory, prejudicial, or biased manner. Rather the defendant argues that because of the sheer quantity of the coverage he was prejudiced. The testimony, the exhibits, and the results of the voir dire examination of prospective jurors demonstrate otherwise. We find no abuse of discretion by the lower court in denying defendant's motion for a change of venue or of venire.

## II. DEFENDANT'S ALLEGATION THAT HE WAS NOT A PRINCIPAL IN THE FIRST DEGREE TO THE NEXUS CRIMES OF ROBBERY AND RAPE

The defendant contends that he should not have been convicted under Virginia's capital murder statute because the evidence was allegedly insufficient to establish that he was a principal in the first degree to the nexus crimes of robbery and rape.

Code § 18.2-31 defines the offenses which constitute capital murder and which are punishable as a Class I felony. They include:

(d) The willful, deliberate and premeditated killing of any person in the commission of robbery while armed with a deadly weapon;

(e) The willful, deliberate and premeditated killing of a person during the commission of, or subsequent to, rape. . . .

The position of the defendant is that no defendant who has committed a murder during the course of a robbery or a rape can be convicted of capital murder unless he can also be convicted as a principal in the first degree of the robbery or the rape. Briley relies on *Johnson* v. *Commonwealth,* 220 Va. 146, 255 S.E.2d 525 (1979), where we held that only the actual murderer, *i.e.,* the "triggerman,"

could be subject to execution under Code §18.2-31. *Johnson* involved an interpretation of Code §18.2-18, which provides:

> In the case of every felony, every principal in the second degree and every accessory before the fact may be indicted, tried, convicted and punished in all respects as if a principal in the first degree; *provided*, however, that except in the case of a killing for hire under the provisions of § 18.2-31(b) an accessory before the fact or principal in the second degree to a capital murder shall be indicted, tried, convicted and punished as though the offense were murder in the first degree. (Emphasis ours.)

In *Johnson* we held that because of the proviso added to the statute in 1977, "only the person who is the immediate perpetrator may be a principal in the first degree and thus liable to conviction for capital murder." 220 Va. at 150, 255 S.E.2d at 527. "Thus, in order to convict [the] defendant of capital murder, the jury [is] required to find that he actually fired the fatal shot." *Id.* at 150, 255 S.E.2d at 527. We have not previously had occasion to consider whether this restriction on capital murder convictions should be extended to prohibit the conviction under the capital murder statute of one who kills during a robbery or rape but is not a principal in the first degree of the nexus crime.

Summarizing, the evidence of the Commonwealth established that the defendant and his three confederates believed that Wilkerson had a large sum of money in his home and that, acting in concert, they planned and executed the robbery, rapes, and murders that occurred on the evening of October 19, 1979. They entered the home after satisfying themselves that it was then occupied only by members of the household. The adult occupants were bound and gagged. Officers testified that the house was completely ransacked, drawers opened and contents strewn about, beds stripped of sheets, and other acts committed which normally accompany a robbery and a search of premises for money and articles of value. Two guns were stolen from the Wilkerson home, and two of the robbers left the premises carrying bags. After the robbery the perpetrators assembled and divided the "take." Meekins received his share, approximately $100, from Linwood and James. Clearly the evidence established that the defendant and his three companions were armed and committed robbery, and that during the course thereof the defendant murdered Mrs. Barton and her child. It is equally as clear from the evidence that during the course of

the robbery and after Mrs. Barton had been bound and gagged, she was raped repeatedly by her assailants. It is the defendant's contention that he was not a principal in the first degree of rape and therefore should not have been found guilty of capital murder.

The evidence establishes that James Briley was a principal in the first degree in the robbery and at least a principal in the second degree in the rape that occurred on the night he murdered Mrs. Barton and her son. Moreover, in Virginia a principal in the second degree is held as culpable as one in the first degree. Code § 18.2-18. James Briley assisted in the planning and execution of all the crimes that were committed in the Wilkerson home. He and his brother Linwood were the first to enter the home, and they immediately bound and gagged the two adult occupants, thereby making it possible or easier for the four intruders to rob, rape, and murder. James was present at all times and gave aid and comfort to his three confederates, and he was therefore equally responsible for what they did. *Spradlin* v. *Commonwealth,* 195 Va. 523, 79 S.E.2d 443 (1954). *See also Washington* v. *Commonwealth,* 216 Va. 185, 217 S.E.2d 815 (1975).

We hold that § 18.2-31 does not require proof that a defendant charged with murder during the commission of a robbery or a rape was a principal in the first degree to the crimes of robbery or rape. It is only necessary that the Commonwealth prove that the defendant was the triggerman in the murder and an accomplice in the robbery or rape to convict him of capital murder.

## III. ALLEGED SUPPRESSION OF EVIDENCE FAVORABLE TO DEFENDANT

Defendant alleges that he was prejudiced by the failure of the Commonwealth to disclose to him prior to trial certain taped and written interviews between Meekins and Detectives Norman A. Harding and D. C. Gery. The record discloses no written motion for discovery as required by Supreme Court Rule 3A:14(b).[3] The only formal request by defendant for the statements occurred during the trial and was granted by the trial judge. Counsel for the defendant represents that prior to trial, and on "a number of occasions" after the preliminary hearing, they inquired of the Commonwealth's Attorney if there were any recorded statements and requested a copy if such existed.

---

[3] At a hearing held on January 18, 1980, prior to trial, both defense counsel and the Commonwealth's Attorney expressed satisfaction with the extent of discovery provided by each without the necessity of a formal motion by the other.

They say that on each occasion the prosecuting attorney answered: "I have no *Brady* material in my file."

The three bodies were not discovered until October 21, 1979, a discovery which precipitated tremendous police activity. The Brileys and Meekins were immediately suspected as being involved in the murders, rapes, and robbery because they had been observed by the police in the vicinity of the Wilkerson home. Linwood Briley and Meekins were arrested about 7:30 p.m. on October 22, and were told that the police were investigating the Barton Avenue murders. Because Meekins was a minor the officers did not interrogate him until his mother and father had arrived at the police station and were present. The officers related to Meekins an account of his movements and that of the Brileys prior to and after the murders, and they described to him the murder scene. They removed Meekins' tennis shoes which, because of their condition, they suspected had been worn by him on the night of the murders and left prints in blood at the Wilkerson home. The parents of Meekins urged their son to "tell the truth," at which time Meekins made a statement admitting his presence with the Brileys at the scene of the murders. The following day counsel was appointed for Meekins and thereafter, on October 25, Meekins made a detailed confession to the police, admitting that he killed Harvey Wilkerson and implicating himself and the three Brileys in the robbery, murders, and rapes. Both statements were first taped and thereafter transcribed.

At the conclusion of the Commonwealth's case, and after Meekins had testified, counsel for the defendant moved for a mistrial upon the ground that the Commonwealth had withheld from them the tapes and transcripts of the interviews between Meekins and the police. The court denied the defendant's motion but required the Commonwealth to make available to the defense both the tapes and the transcripts, and this was done.

The defense alleges that there are inconsistencies between the testimony given by Meekins at trial and some of his responses in the interviews conducted by the police. Although the trial court found few inconsistencies it gave counsel for the defendant an opportunity to examine the tapes and transcripts, and then permitted them to recall both Meekins and Officer Harding and cross-examine them on any inconsistencies which the defense considered material, or to which they took exception.

Defendant relies primarily on *Brady* v. *Maryland,* 373 U.S. 83 (1963), and *Stover* v. *Commonwealth,* 211 Va. 789, 180 S.E.2d 504

(1971), *cert. denied,* 412 U.S. 953 (1973), which hold that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process when the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady,* 373 U.S. at 87, *Stover,* 211 Va. at 795, 180 S.E.2d at 509. The defense argues that in the case under review identification of the murderers was the primary issue and that the credibility of Meekins, the key witness for the prosecution, was critical to defendant's case. They argue that any inconsistencies between Meekins' original representation of events to the officers and his testimony on the witness stand affected his credibility and could have had an effect on the outcome of the trial. Defendant claims that disclosure during trial was not sufficient or timely.

The Commonwealth, relying upon *United States* v. *Agurs,* 427 U.S. 97 (1976), discusses the three categories in which a prosecutor might have an affirmative duty to disclose to the defense certain evidence. The first category is where a prosecutor knowingly uses perjured testimony, in which event a defendant has only to prove a reasonable likelihood that the testimony could have affected the jury's judgment. The second category, the *Brady* category, is where a defendant makes a specific request for certain evidence, but it is not disclosed. There, a conviction will be reversed if the evidence might have affected the trial's outcome. The third category is where no request is made or where a general request for all exculpatory evidence is made. There, the conviction is affected only if the evidence was sufficient to create a reasonable doubt that did not otherwise exist.

Obviously, we do not have a perjured testimony situation, and the defendant, prior to the conclusion of the Commonwealth's case, made no motion for the discovery of certain evidence or documents. If any of the three *Agurs* categories are involved here it would be the third, assuming we construe the defendant's oral request made to the Commonwealth's Attorney for any statements by Meekins as a general request for all exculpatory evidence.

We do not construe the statements by Meekins to the police as exculpatory. In *Lowe* v. *Commonwealth,* 218 Va. 670, 679, 239 S.E.2d 112, 118 (1977), *cert. denied,* 435 U.S. 930 (1978), we said: "[T]he core of this due process rule of fairness is that the evidence must be exculpatory, favorable to the accused." The statements involved here amounted to a confession by Meekins of his involvement in the Barton Avenue crimes and an implication of all three Briley brothers. We find nothing in the statement which is of benefit to the defendant.

True, this sixteen-year-old boy did not immediately confess his guilt. His confession, and the implication by him of his confederates, came in stages as he learned that the officers had sufficient information to identify him as one of the perpetrators of the crimes, and only after he had conferred with his parents and his attorney and concluded that it would be to his advantage to make a full and complete statement of what had occurred. The only advantage to the defense that we can perceive from their having the Meekins statement in advance of trial was that they could point out any inconsistencies between it and Meekins' testimony. The opportunity to do this was accorded the defendant by the action of the court. We observe that Meekins admitted on the witness stand that his first statements to the police were false and that some of his testimony at a preliminary hearing was false. This witness also admitted that he would lie to save his own life. We would further note that counsel for the defendant stated that they had attended a portion of the trial of Linwood Briley and had been present when Meekins was cross-examined. The testimony given by Meekins in the instant case therefore came as no surprise to the defense.

The record shows that the reliability of Meekins as a witness, and the truthfulness of his testimony, were painstakingly and exhaustively explored on direct examination, cross-examination, and recross-examination, and that the defendant introduced evidence to discredit the testimony of this witness. We are convinced that an earlier disclosure to defendant of the contents of the tapes and transcripts would have given him little, if any, aid in his assault on the testimony of Meekins.

■ Defendant's motion for a mistrial, based upon the failure of the Commonwealth to have previously made disclosure, came at the conclusion of the Commonwealth's evidence. The trial judge had the alternative of declaring a mistrial or taking curative action. He adopted what we believe was the correct course. He required the Commonwealth to make the tapes and transcripts available to the defense and gave them the opportunity and time to examine their contents. In addition, the trial court permitted recross-examination of Meekins and the detective, thereby giving the defendant an opportunity to point out any inconsistencies between the statements made by Meekins in the tapes and transcripts and the testimony he gave on direct and cross-examination. This less drastic curative action by the trial judge to the granting of a mistrial was indeed appropriate. In the language of Mr. Justice Story, in *United States* v. *Coolidge,* 25 F. Cas. 622, 623 (1815), the discretion to discharge the jury before it has reached a

verdict is to be exercised "only in very extraordinary and striking circumstances." The case under review is not such a case. We find no prejudice to the defendant shown, or any abuse of discretion by the trial court.

## IV. THE CONSTITUTIONALITY OF VIRGINIA CODE § 19.2-264.4(C)

■ Briley contends that his death penalties were imposed under such a broad and vague construction of Virginia's capital murder statute, Code § 19.2-264.4(C), as to violate the Eighth and Fourteenth Amendments of the United States Constitution.

The statute assailed reads as follows:

> The penalty of death shall not be imposed unless the Commonwealth shall prove beyond a reasonable doubt that there is a probability based upon evidence of the prior history of the defendant or of the circumstances surrounding the commission of the offense of which he is accused that he would commit criminal acts of violence that would constitute a continuing serious threat to society, or that his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim.

The jury, after hearing evidence during the sentencing phase of the bifurcated trial, returned a verdict in the language of Code § 19.2-264.4(C), and in the form set forth in § 19.2-264.4(D). Specifically, and in each capital murder case, the jury found that: "[A]fter consideration of his past criminal record that there is a probability that he would commit criminal acts of violence that would constitute a continuing serious threat to society, and/or his conduct in committing the offense is outrageously·or wantonly vile, horrible or inhuman in that it involved torture [depravity of mind; aggravated battery to the victim beyond the minimum necessary to accomplish the act of murder] and having considered the evidence in mitigation of the offense, unanimously fix his punishment at death."

Before the trial court accepted the verdicts it inquired of each member of the jury if both of the two aggravating circumstances enunciated in Code § 19.2-264.4(C) were found. Each member of the jury was polled individually and each responded affirmatively that both aggravating circumstances were present. We attach no signifi-

cance to the failure of the jury to cross out "and" or "or" from its verdict. It plainly appears that the jury found from the defendant's record that there is a probability that he would commit acts of violence that would constitute a continuing serious threat to society, and that his conduct in committing the murders was outrageously and wantonly vile, horrible, and inhuman in that it involved torture, depravity of mind, and aggravated battery to the victim beyond the minimum necessary to accomplish the act of murder. The evidence overwhelmingly sustains the findings of the jury and the actions of the trial court.

The testimony discloses that the defendant's career has been one of crime, including numerous violations of the criminal laws and an armed robbery and attempted murder. The defendant's contempt for the rules of society is further manifested by the fact that his crimes were committed while on parole, and on the same day he had discussed the conditions of his parole with a local judge. We cannot conceive of a better candidate to commit a future robbery, rape, or murder than the defendant.

The outrageous and wanton vileness of the defendant's acts on October 19, 1979, the horror and inhumanity of his conduct, and the torture and mayhem that accompanied the episode all reflect the depravity of the defendant's mind. The jury had before it a defendant who coolly, deliberately, and carefully planned and executed a robbery, a rape, and a murder. He and his companions struck when no one was present in the Wilkerson household other than those who lived there. The occupants were bound and gagged, and the woman was dragged into the kitchen, raped three times, and then dragged back into the living room. The father and son were forced to lie there and witness the indignities inflicted on the mother, and watch their home being ransacked and plundered, while awaiting what all three must have feared would be their executions. The woman was shot by James in the presence of the child and his father. The father was next killed by Meekins and finally the child by James.

We cannot conceive of three murders being carried out under more terrifying conditions or in a more inhuman, outrageous, wanton, horrible, or vile manner. The defendant did not content himself with shooting Mrs. Barton only one time. The testimony disclosed that she was shot four times in the head. The entire massacre was carried out in such a deliberate and premeditated manner, and with such precision and coolness, that it could only have been done by those possessed of depraved minds.

The defendant relies upon *Godfrey* v. *Georgia,* 446 U.S. 420 (1980). An analysis of this case discloses that it turned on its own peculiar facts, and the failure of the state Supreme Court to follow its own criteria laid out in previous cases and to independently assess the evidence of record and determine that such evidence supported a finding of aggravated circumstances. The Court in *Godfrey* was not satisfied that the record disclosed the aggravating circumstances necessary for a conviction of capital murder. It noted that the defendant there, beset with domestic problems with his wife, and believing that his mother-in-law was frustrating a reconciliation, went to a trailer occupied by the two women, shot his wife in the head through a window, killing her instantly, entered the trailer, and then shot and killed his mother-in-law instantly. Godfrey called the sheriff's office, reported what he had done and asked to be arrested. He accepted full responsibility for the killings, describing them as "a hideous crime." He later told a police officer, "but I have been thinking about it for eight years . . . I'd do it again." At trial he relied upon the defense of temporary insanity. 446 U.S. at 426.

A review of the facts in the instant case demonstrates such a degree of atrociousness as to readily distinguish it from the facts in *Godfrey.* Godfrey was an emotionally distraught husband. Briley is a cool, calculating, and depraved murderer, rapist, and robber. Godfrey killed without warning and instantly. Briley killed only after his greed and lust had been satisfied. The victims in *Godfrey* did not have to experience the horror of waiting for their executions. The victims of Briley did.

In *Smith* v. *Commonwealth,* 219 Va. 455, 478, 248 S.E.2d 135, 149 (1978), *cert. denied,* 441 U.S. 967 (1979), we construed the words "depravity of mind" to mean "a degree of moral turpitude and psychical debasement surpassing that inherent in the definition of ordinary legal malice and premeditation." We construed "aggravated battery" as "a battery which, qualitatively and quantitatively, is more culpable than the minimum necessary to accomplish an act of murder." Thereafter in *Clark* v. *Commonwealth,* 220 Va. 201, 211, 257 S.E.2d 784, 790-91 (1979), *cert. denied,* 444 U.S. 1049 (1980), we commented on these definitions as follows:

> This does not mean, however, that those definitions are the best or the only ones. We agree with the trial court that the terms used in the statute are commonly used and each has an accepted meaning. While the terms may have been defined in an instruction to the jury, in a manner satisfactory to this Court, the fact

that the trial court did not choose to give such a definitional instruction does not constitute reversible error. Although in our review of this case we are guided by our definitions in *Smith*, it does not necessarily follow that these particular definitions were necessary for the jury to determine whether the conduct of Clark was outrageously or wantonly vile, horrible, or inhuman in that it involved depravity of mind or aggravated battery of the victim.

In *Martin* v. *Commonwealth*, 221 Va. 436, 439-40, 271 S.E.2d 123, 125-26 (1980), we said that Code § 19.2-264.2 is not unconstitutionally vague.[4] We therefore find no merit in defendant's assignments which question the constitutionality of Virginia's capital murder statutes, or in his argument that the death penalties were imposed upon him under such a broad and vague construction as to violate his constitutional rights.

In discharge of the duty imposed on this court to review death sentences, § 17-110.1(C), we determine that there is no evidence or any suggestion that the verdicts of the jury and the sentences imposed by the trial court on the defendant were returned and imposed under the influence of passion, prejudice, or any other arbitrary factor.

We have heretofore pointed out the evidence which supports the findings by the jury, and by the trial court, of the defendant's depravity of mind, of the aggravated battery that accompanied the murders, and the probability that defendant would hereafter commit acts of violence and would constitute a continuing serious threat to society. In determining whether the sentences imposed on Briley are excessive or disproportionate to the penalties imposed in similar cases, we have reexamined the capital murder cases involving the death penalty that we have reviewed and affirmed since Code § 17-110.1(C) was enacted.[5]

From this reexamination we conclude that the sentences of death

---

[4] Section 19.2-264.2 provides the "conditions for imposition of the death sentence" and tracks the language of § 19.2-264.4(C).

[5] *Linwood Briley* v. *Commonwealth*, 221 Va. 532, 273 S.E.2d 48 (1980); *Turner* v. *Commonwealth*, 221 Va. 513, 273 S.E.2d 36 (1980); *Giarratano* v. *Commonwealth*, 220 Va. 1064, 226 S.E.2d 94 (1980); *Stamper* v. *Commonwealth*, 220 Va. 260, 257 S.E.2d 808 (1979), *cert. denied*, 445 U.S. 972 (1980); *Coppola* v. *Commonwealth*, 220 Va. 243, 257 S.E.2d 797 (1979), *cert. denied*, 444 U.S. 1103 (1980); *Clark* v. *Commonwealth*, 220 Va. 201, 257 S.E.2d 784 (1979), *cert. denied*, 444 U.S. 1049 (1980); *Mason* v. *Commonwealth*, 219 Va. 1091, 254 S.E.2d 116, *cert. denied*, 444 U.S. 919 (1979); *Waye* v. *Commonwealth*, 219 Va. 683, 251 S.E.2d 202, *cert. denied*, 442 U.S. 924 (1979); *Smith* v. *Commonwealth*, 219 Va. 455, 248 S.E.2d 135 (1978), *cert. denied*, 441 U.S. 967 (1979).

imposed on Briley are not excessive or disproportionate to the penalties imposed in similar cases, considering the crimes, the manner in which they were committed, and the past criminal record of the defendant. Unlike *Godfrey*, it can be said here that the murders by the defendant were committed under such conditions and circumstances as to reflect "a consciousness materially more 'depraved' than that of any person guilty of murder." *Godfrey*, 446 U.S. at 433.

We have reviewed all assignments of error made by the defendant, and have considered all questions presented by his appeal, and finding no reversible error in his convictions and sentences, and no other reason to disturb or commute his death sentences, we affirm the judgments of the lower court.

*Affirmed.*