## Richmond

### RICHARD LEE WHITLEY

### V.

### COMMONWEALTH OF VIRGINIA

January 22, 1982.

Record No. 811071.

Present: Carrico, C.J., Cochran, Poff, Compton, Thompson, and Stephenson, JJ., and Harrison, Retired Justice.

*Warren W. McLain; Norman A. Townsend (Kendrick, Gearheart, Aylor & Lockowandt; Graber, Stetler & Townsend,* on briefs), for appellant.

*Richard B. Smith, Assistant Attorney General (Marshall Coleman, Attorney General,* on brief), for appellee.

POFF, J., delivered the opinion of the Court.

In a bifurcated trial of an indictment under Code § 18.2-31(d), a jury convicted Richard L. Whitley of capital murder in the commission of robbery while armed with a deadly weapon and fixed his punishment at death. The trial court confirmed the conviction, considered the probation report, and imposed the sentence fixed by the jury. We have consolidated Whitley's statutory right of sentence review with his appeal from the conviction and accorded the case priority on our docket.

The evidence leaves no doubt that Whitley killed Phebe Parsons, his next-door neighbor. The 63 year-old widow lived alone, and the crime, committed the night of July 25, 1980, a Friday, was not discovered until the following Monday. The investigating officers found a mass of dried blood on the floor inside the front door and a trail of blood leading to Mrs. Parsons' nude body which was lying beneath a pile of clothes and other articles on the floor beside her bed. Her blood-soaked clothing and a link from a watchband (later identified as Whitley's) lay on the floor near the front door. The home was in disarray and the victim's wallet was missing from her purse which was hanging on a hook near the back door.

An autopsy revealed a neck laceration 4¾" long, gaping to 2", a ligature mark on the neck, a ½" cut on the forehead, and several abrasions and contusions on the upper back and right elbow. An umbrella of conventional design had been inserted into the vaginal cavity, puncturing the vaginal wall and bruising the small intestine. A collapsible umbrella had been forced into the rectal cavity, piercing the wall and damaging a major artery. The medical examiner testified that there was "very little evidence of hemorrhage" in either cavity, a circumstance which indicated that "the individual had little, if any, heartbeat at the time they were inserted or was dead." In his opinion, death was caused by the neck wound or strangulation.

According to several statements Whitley made to the police, all of which were admitted into evidence, Whitley had gone to Mrs. Parsons' home early in the evening of July 25 to use her telephone. He called his employer, Garry Monohan, who agreed to come to Whitley's home to repair his "broken down" car. When two hours had passed and Monohan had not arrived, the defendant returned to Mrs. Parsons' home and made a second call. As he approached the front door to leave, Mrs. Parsons stopped him and "we were talking about my wife and going to church and everything and the next thing I know she was dead." Whitley explained to the officers that "there had been some trouble" with his wife's 10 year-old daughter by a previous marriage and that both had left him.

Whitley admitted that he had choked Mrs. Parsons with his hands, strangled her with a rope, and cut her jugular vein with a Boy Scout pocketknife as she prayed for her life. He lifted her from the floor near the front door, dragged her to the bedroom, and attempted, without success, to place her on the bed. He did not remember removing her clothes or inserting the umbrellas in her body, and he denied that he had engaged in any sexual conduct. Abandoning his effort to get her body on the bed, he "ransacked" the house, "looking for a gun." Finding none, he took Mrs. Parsons' car keys and credit cards from her purse, replaced the purse on its hook, left by the back door, and fled in Mrs. Parsons' car. Arrested in Florida, Whitley confessed his guilt and waived extradition.

Mrs. Parsons' daughter testified that, during the month before the murder, Whitley had indicated an interest in buying a car she owned. Called as a defense witness, Whitley's employer testified that he had paid Whitley his wages, $112.45, on the day of the crime. Monohan was never asked to verify Whitley's statement that he had telephoned him that night.

Addressing the conduct of the guilt phase of his trial, Whitley assigns multiple evidentiary and constitutional errors and asks us to reverse his conviction. In the alternative, he prays that we commute his sentence of death to imprisonment for life.

## I. THE GUILT TRIAL

### A. *Sufficiency of the Evidence*

 Code § 18.2-31 defines capital murder as a "willful, deliberate and premeditated killing" in the commission of certain felonies. The defendant argues that "the Commonwealth failed to prove beyond a reasonable doubt that the killing was premeditated." While the intent to kill must be the product of premeditation, in the determination of premeditation *vel non* the interval between the formation of the intent and the killing itself is not a controlling consideration. *Hairston v. Commonwealth,* 217 Va. 429, 431-32, 230 S.E.2d 626, 628 (1976). Yet, time may be relevant. According to Whitley's own extra-judicial statements, he choked his victim with his hands; from some source undisclosed by the record, he obtained a rope and strangled her; then, taking his knife from his pocket, he cut her throat. Plainly, this was not a killing conceived and executed instantaneously. Whitley had ample time to meditate and deliberate, and the savage techniques he employed evince a calculated, persistent intent to kill a defenseless person.

The defendant contends that the statements he gave the police support a different theory, *viz.,* that "something in Mr. Whitley's conversation with his victim about church and his wife and stepdaughter provoked the fatal attack," that the killing was an act of "passion and uncontrolled rage," and that this hypothesis is inconsistent with the jury's conclusion that the killing was premeditated. Obviously, the jury did not find this hypothesis reasonable, and we hold that the evidence was sufficient to sustain its conclusion.

 Challenging the sufficiency of the evidence on another point, the defendant maintains that his conviction of capital murder in the commission of armed robbery "cannot be sustained unless there is evidence . . . that he formed the specific intent to steal from the victim either *before* or *during* the killing". If the intent was not formed until the victim was dead, he says, "the taking would at most constitute a larceny and the killing first-degree murder." Pointing to certain comments the Commonwealth's Attorney made in closing argument which tend to endorse that view, Whitley relies upon the fact, uncontradicted of record, that all the property stolen was taken after Mrs. Parsons

expired. Thus, he reasons, there was no evidence to prove that the murder was committed with intent to rob.

In oral argument, the Attorney General suggested that the language of Code § 18.2-31(d) could be construed to mean that first-degree murder is a capital offense when the killing and the crime of armed robbery are part of a continuing criminal enterprise. So construed, the statute does not require the Commonwealth to prove the coexistence of the intent to kill and the intent to steal. While such may be a viable construction, we need not decide that here. Reviewing the conviction under the statute as construed at trial, we consider whether the evidence was sufficient to support the conclusion that the murder was committed with intent to rob.

Clearly, the theft Whitley confessed constituted robbery rather than simple larceny. Robbery, defined at common-law as "the taking, with intent to steal, of the personal property of another, from his person or in his presence, against his will, by violence or intimidation", *Jones* v. *Commonwealth,* 218 Va. 18, 21, 235 S.E.2d 313, 315 (1977), is a crime against the person of the victim rather than a crime against property. While the violence or intimidation must precede or be concomitant with the taking, it is immaterial that the victim is dead when the theft occurs. For purposes of the common-law definition, a corpse is a "person" if "the taking occurs minutes after the victim is killed". *Wm. Patterson* v. *Commonwealth,* 222 Va. 653, 664, 283 S.E.2d 212, 219 (1981). The question, then, is whether robbery was the motive for the killing.

 Criminal intent, a state of mind, may be, and often must be, shown by circumstantial evidence. *Ridley* v. *Commonwealth,* 219 Va. 834, 836, 252 S.E.2d 313, 314 (1979). Whitley contends that, in light of the circumstances disclosed by his extra-judicial statements and the physical evidence, the jury should have found that the killing was the act of a "sexual psychopath" and that the larceny was committed "only as an after-thought." But the fact that the larceny did not occur until after he had killed his victim does not prove that his decision to steal was an after-thought. And the jury logically could have concluded that both sex and robbery motivated his conduct.

Moreover, Whitley's hypothesis, offered in mitigation of the grade of his offense, is legally significant only if it is reasonably supported by the evidence viewed in the light most favorable to the Commonwealth. His theory ignores certain facts bearing upon the question of intent. Whitley had expressed an interest in ac-

quiring a car owned by Mrs. Parsons' daughter. On the night of the crime, Whitley's car was "broken down." His next-door neighbor owned a car. Whitley stole Mrs. Parsons' car. The jury was not required to believe Whitley's statement that his purpose in entering Mrs. Parsons' home was to use her telephone, and the jury doubtless noted that the person to whom the calls allegedly were made was never asked to verify the allegation. Considering the totality of the circumstances disclosed at trial, the jury could have concluded that the defendant needed the use of a car; that his purpose in going to his neighbor's home was to steal or borrow one; that his neighbor refused to give him the keys and turned the conversation to talk about his wife and "going to church and everything;" and that the defendant, frustrated, humiliated, and enraged, decided at that moment to kill her, ransack the house for the keys, and steal her car.

We are of opinion that the evidence was fully sufficient to support the conclusion that Whitley murdered Mrs. Parsons with intent to rob her of her automobile.[1]

## B. *Admissibility of Evidence*

■ Overruling the defendant's motion *in limine,* the trial court admitted into evidence a black-and-white photograph showing Mrs. Parsons' body in the gruesome condition in which it was found by the investigating officers. Assigning error to the ruling, Whitley argues that the photograph was inadmissible because it supplied no "probative evidence not provided by other evidence" and, therefore, that "the prejudicial effect of the exhibit outweighs its probative value."

---

[1] Attacking the ruling against his motion to strike the evidence as insufficient, the defendant also charges that he was denied due process because, he says, the trial judge did not consider his motion maturely and ruled peremptorily "with one eye on the proceedings and one eye on the clock." The transcript of the proceedings does not support the charge. The comments made by the trial judge concerning the hour were related to his decision whether to attempt to complete the evidence that day or the next. At the conclusion of the defendant's argument on his motion, the transcript of which consumes 13 pages in the record, the trial judge denied the motion and assigned the reason for his ruling: "Viewing all the evidence that has been submitted it is my opinion that his intent and motive is entirely a jury question." It is obvious that the judge carefully considered the defendant's challenge to the sufficiency of the evidence and, as we have indicated, his ruling was correct.

We find no merit in this assignment of error. In a recent capital case, we rejected the same argument addressed to the admission of similar photographs.

> The admission of the photographs rested within the sound discretion of the trial court, and, in the absence of an abuse of discretion, we will not disturb the court's action. While the Commonwealth did have other evidence available to establish the elements of the offense, the photographs portrayed more graphically, but not more inflammatorily, than the testimony of any witness the methodical manner in which the killing of the victim was accomplished. Thus, the photographs were " 'relevant and material to establish premeditation and malice and to show the degree of atrociousness of the crime.' " (Citations omitted).

*Waye v. Commonwealth,* 219 Va. 683, 692, 251 S.E.2d 202, 208, *cert. denied,* 442 U.S. 924 (1979).

■ Raising another challenge to the presentation of evidence, the defendant says that "the Commonwealth's attempted introduction into evidence of other crimes involving Mr. Whitley deprived him of . . . a fair trial and . . . due process of law."

In the course of rebuttal to the defendant's cross-examination of one of the officers who had interviewed him, the Commonwealth's Attorney asked if Whitley had explained why his wife had left him. The officer replied: "He stated that there had been some trouble with his daughter and that she took the daughter." Asked if Whitley had told him "what happened with the daughter" or "why the daughter had left", the officer answered, "No, sir."

The defendant asserts that "the Commonwealth Attorney's questions were intended to imply sexual improprieties involving Mr. Whitley and his daughter"; that "[e]vidence of prior bad acts is incompetent and inadmissible"; and that the asking of the questions "constituted reversible error."

As the transcript of the officer's testimony on cross-examination reveals, the defendant had initiated the line of questioning pursued by the Commonwealth's Attorney in rebuttal. And we observe that, while defense counsel objected to his questions on relevancy grounds, he did not assign the ground he urges on appeal. Nor did he move for a mistrial or seek a curative instruction on account of the prejudice he now perceives. Aside from these con-

siderations, we demur to Whitley's due process complaint because he has shown no prejudice. As we read the dialogue, the implication raised by the questions and answers was speculative at most, and we cannot assume that the jury drew the inference Whitley suggests in hindsight.

## C. *Improper Argument*

██ During summation in chief, the Commonwealth's Attorney said: "If at any moment before he kills her he intends to steal what she owns he is guilty of capital murder, that's the law. . . . He killed her, he stole from her. All we have to do is look at those facts and we say, could he possibly have intended that." This, the defendant contends, was a prejudicial misstatement of the Commonwealth's burden of proof. The Attorney General responds that the error, if any, was cured because the instructions (which were read to the jury by the trial judge and delivered in written form to the jury room) correctly defined the burden of proof.

During rebuttal argument, the Commonwealth's Attorney stated: "Members of the jury, I waited in vain for counsel to give you some reason that this defendant . . . may have engaged in all of that violence before he stole this woman's property. As I say, I waited in vain." Whitley characterizes this statement as a comment on the defendant's failure to testify in violation of his Fifth Amendment right to remain silent. Rebutting this view and invoking the test adopted in *Hines* v. *Commonwealth,* 217 Va. 905, 907, 234 S.E.2d 262, 263 (1977), the Attorney General argues that the statement was a comment on the failure of the defendant's *counsel* to offer some explanation during closing argument for the violence preceding the larceny and not a comment on the defendant's failure to take the stand.

The Attorney General's arguments appear persuasive. However, the record shows that the defendant voiced no objection to either statement, either at the time it was made or in post-conviction motions. Applying the contemporaneous objection rule, we decline to consider these issues on their merits. *Shifflett* v. *Commonwealth,* 212 Va. 741, 744, 187 S.E.2d 174, 176 (1972); *Russo* v. *Commonwealth,* 207 Va. 251, 257-58, 148 S.E.2d 820, 825 (1966).

## II. CONSTITUTIONAL CHALLENGES

### A. *Facial Constitutionality*

 The defendant asks us to adopt the view that the death penalty constitutes cruel and unusual punishment "in all cases". We reaffirm our prior decisions disavowing a *per se* rule.

 Even so, Whitley contends that "the Virginia capital murder statute is unconstitutional on its face". More precisely, he believes that the legislative gradation of homicide offenses is constitutionally infirm. A person convicted of one of the species of homicide defined in Code § 18.2-31 may be sentenced to death, regardless of the degree of vileness attending the killing, if the jury rests its decision upon the so-called "dangerousness" standard. Code § 19.2-264.2. On the other hand, a person convicted of first-degree murder is never subject to the supreme penalty, even when the vileness is greatest and the offense most heinous. Hence, Whitley argues, the homicide statutes permit juries to impose the death penalty arbitrarily and capriciously in violation of the due process clause and the Eighth Amendment.

A criminal statute which affords a sentencing judge or jury an unbridled choice between the death penalty and a lesser sentence violates the Eighth and Fourteenth Amendments. *Furman* v. *Georgia,* 408 U.S. 238 (1972). But sentencing discretion is constitutionally permissible if it is "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg* v. *Georgia,* 428 U.S. 153, 189 (1976). The *Gregg* court upheld Georgia's statutory system (revised in response to *Furman*) because it limited discretion to impose the death penalty to offenses involving "aggravating circumstances", established standards directing sentencing procedures, and authorized appellate review as a matter of right. In *Jurek* v. *Texas,* 428 U.S. 262 (1976), the Supreme Court found that, while the Texas statute did not contain a particularized list of aggravating circumstances, its definitions of the five categories of capital murder required "that the jury find the existence of a statutory aggravating circumstance before the death penalty may be imposed", *id.* at 270-71, and that these definitions satisfied the rule in *Gregg.*

Five of the seven definitions of capital murder in Code § 18.2-31 are substantially identical, and none are antithetical, to those approved in *Jurek.* See relevant provisions of the Texas statute, *id.* at 265, n1. And, of special significance to the issue Whitley

raises here, the Texas statute, like our own, fixed the maximum penalty for non-capital murder at life imprisonment. *Id.* For purposes of constitutional analysis, the two statutory schemes are indistinguishable.

Homicide statutes are designed to protect society. The need for protection varies with the gravity of the offense against society. The definition and gradation of offenses require public policy judgments. Such judgments are made for society by the legislative representatives it chooses. And such legislative judgments are constitutionally sufficient unless the courts can say that the severity of the penalty prescribed is not rationally related to the gravity of the attendant offense.

The General Assembly has defined two grades of manslaughter, three grades of murder, and seven sub-species of the highest grade of murder. It has determined that, aside from the kind of violence employed, murder committed under any of seven selected circumstances is more culpable in terms of societal harm than other forms of murder, and, as a matter of public policy, has prescribed graduated penalties for different grades of homicide.

We believe the grades of the offense and their respective penalties are rationally related, and, considering the sentencing standards and procedures the capital murder statutes mandate, we hold that sentencing discretion is "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg,* 428 U.S. at 189.

### B. *Constitutionality As Applied*

Whitley next contends that the so-called "vileness" standard of Code § 19.2-264.2 is unconstitutional as applied in his case.

The jury based the death penalty upon the vileness standard rather than the dangerousness standard. Relying upon the plurality opinion in *Godfrey* v. *Georgia,* 446 U.S. 420 (1980), the defendant urges us to construe the vileness standard to mean that the death penalty is not a constitutionally-permissible sentencing option unless " 'aggravated battery' be proven by evidence of serious physical abuse before death." Here, Whitley insists, "the evidence conclusively shows that the victim died prior to any physical abuse".

The statutory construction Whitley urges, one announced by the Georgia Supreme Court in *Blake* v. *State,* 239 Ga. 292, 236

S.E.2d 637 (1977), and noted in passing in *Godfrey,* was not the *ratione decidendi* in *Godfrey.* Godfrey's victim died almost instantaneously from a single gunshot, and the defendant's sentence was "based upon no more than a finding that the offense was 'outrageously or wantonly vile, horrible and inhuman.'" *Godfrey,* 446 U.S. at 428. Such an amorphous finding, unrelated to any constituent element of the statutory definition, was constitutionally insufficient to support the death penalty. The Supreme Court was not required to decide, and did not decide, whether an aggravated battery must precede the victim's death in order to satisfy the vileness standard.

Nor need we decide that question here, for the evidence fully supports the conclusion that Mrs. Parsons' death was the result of aggravated battery upon her person. We do not refer to Whitley's violent abuse of her body cavities, even though the medical testimony does not exclude the possibility that her heart was still beating when the umbrellas were inserted. We have construed the term "aggravated battery" as used in Code § 19.2-264.2 to mean "a battery which, qualitatively and quantitatively, is more culpable than the minimum necessary to accomplish an act of murder."[2] *Smith* v. *Commonwealth,* 219 Va. 455, 478, 248 S.E.2d 135, 149 (1978), *cert. denied,* 441 U.S. 967 (1979). According to Whitley's own account, he first choked his defenseless victim with his bare hands; next, he acquired a rope and strangled her; and then, taking his knife from his pocket, he cut her throat. Each of Whitley's several acts was deliberate, each was brutal and potentially fatal, and, together, all were more than the minimum necessary to accomplish the murder.

We are of opinion that the jury properly could have found that Whitley's serial assaults upon Mrs. Parsons constituted an aggravated battery within the intendment of the statutory vileness standard, and we reject his constitutional complaint.

---

[2] On appeal, Whitley complains that the jury was not instructed on this definition. *See Godfrey,* 446 U.S. at 437 (Marshall and Brennan, concurring). *Contra, James Dyral Briley* v. *Commonwealth,* 221 Va. 563, 579-80, 273 S.E.2d 57, 67 (1980); *Clark* v. *Commonwealth,* 220 Va. 201, 211, 257 S.E.2d 784, 790-91 (1979), *cert. denied,* 444 U.S. 1049 (1980). The record shows the defendant did not offer or request such an instruction at trial, and we will not notice a non-jurisdictional question raised for the first time in a reply brief filed in this Court. Rule 5:21.

## III. THE POST-CONVICTION HEARING

Code § 19.2-264.5 provides that, after consideration of a report of a probation officer concerning "the history of the defendant and any and all other relevant facts", the trial judge "may set aside the sentence of death and impose a sentence of imprisonment for life." As Whitley points out, the narrative portion of the historical report revealed that he had been "accused" of three forcible sexual offenses, and Whitley argues that, notwithstanding the jury's failure to do so, the trial judge should have accepted his theory that sex rather than robbery was the motive for the killing. Accordingly, he asserts the trial judge erred in confirming the jury's verdict.

But the probation report also contained a long list of charges and convictions of automobile larceny, burglary, breaking and entering, and other crimes, as a result of which, Whitley had "spent most of his adult life incarcerated in . . . Illinois or . . . Nevada". Such a history, inadmissible at the guilt trial, reinforces the jury's finding that the killing occurred in the commission of armed robbery of Mrs. Parsons' car, and we hold that the trial court committed no error in confirming the jury's verdict.

## IV. THE PENALTY TRIAL

Under statutory mandate, we now review the record of both phases of the trial to determine whether the death penalty fixed by the jury and confirmed by the trial judge was the product of "passion, prejudice or any other arbitrary factor" or "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Code § 17-110.1C.

Renewing his argument that the motive for the killing was not robbery, Whitley contends that "evidence and argument in the guilt phase which evidenced sexual abuses . . . were in no way probative of an intent to rob" and that the effect thereof was "to inflame the jury and to cause them to be prejudiced against Mr. Whitley." Whitley does not specify the "sexual abuses" to which he refers. Those mentioned in the probation report were not before the jury. Code § 19.2-264.4B. Those discussed in Part I B, *infra,* were not reasonably implied. We assume, then, that the defendant has reference to the medical evidence showing the abuses of Mrs. Parsons' body cavities.

Whitley did not challenge the admissibility of this evidence. Rather, he contends on appeal that it was prejudiciously inflammatory. We have no doubt that it offended the sensibilities of the jury. But while evidence of Whitley's use of the umbrellas was offensive, so was the evidence of his use of the rope and knife, assaults committed in pitiless disregard of a defenseless victim's pleas for mercy.

The defendant suggests nothing further to support his argument that the death penalty was the product of passion or prejudice, and, finding nothing of record, we turn to the final question.

■ Relying again upon his theory that Mrs. Parsons' death did not occur in the commission of armed robbery and, thus, that the killing did not constitute capital murder, Whitley argues that we must compare his case with other non-capital murder cases "in which the victim was sexually abused but not raped or robbed." Such a comparison, he says, compels a conclusion that "Whitley's sentence is clearly excessive and disproportionate."

But we have held that the evidence supports the jury's finding that the murder occurred in the commission of armed robbery and that Whitley's multiple assaults constituted an aggravated battery within the contemplation of the vileness standard. Whitley's argument, therefore, rests upon a faulty premise.

In order to guard against arbitrary, capricious, and discriminatory imposition of the death penalty, Code § 17-110.1C2, E, requires that we compare the case under review with "similar cases" and, in aid of that comparison, to "accumulate the records of all capital felony cases . . . as a guide in determining whether the sentence imposed in the case under review is excessive." In the first case decided after the effective date of that statute, we entered an order directing the Clerk of this Court to comply with the legislative directive. *See Smith* v. *Commonwealth,* 219 Va. at 482, n. 8, 248 S.E.2d at 151. The Clerk has done so. All capital murder cases, including not only those in which the death penalty was imposed and reviewed by this Court but also those in which the jury or trial judge imposed a life sentence and the defendant petitioned this Court for appeal of his conviction, have been inventoried and indexed apart from other criminal cases.

We have analyzed the facts and circumstances in each case. None is factually *identical* to Whitley's case. However, we have affirmed death sentences in several capital murder cases where the aggravated battery was fairly comparable to that Whitley com-

mitted.[3] And it appears from our examination of capital cases where a life sentence was imposed that the lesser penalty was selected because the battery was less aggravated, or because the jury or trial judge found that the aggravating circumstances were outweighed by mitigating circumstances, or because the sentencing authority was moved by an impulse of mercy. Such discretion in the sentencing authority is not constitutionally infirm. The Constitution requires only that the jury's exercise of its discretion be properly guided. "Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution." *Gregg,* 428 U.S. at 199. *Accord, Smith* v. *Commonwealth,* 219 Va. at 479-80, 248 S.E.2d at 150.

Our analysis convinces us that the penalty imposed upon Whitley was not "excessive or disproportionate to the penalty imposed in similar cases", Code § 17-110.1C2, and we will affirm the conviction and uphold the death penalty.

*Affirmed.*

---

[3] *Justus* v. *Commonwealth,* 222 Va. 667, 283 S.E.2d 905 (1981) (pregnant victim raped; killed by three equally fatal gunshot wounds to head); *Coppola* v. *Commonwealth,* 220 Va. 243, 257 S.E.2d 797 (1979), *cert. denied,* 444 U.S. 1103 (1980) (victim beaten repeatedly, choked; death resulted from blows to head); *Clark* v. *Commonwealth,* 220 Va. 201, 257 S.E.2d 784 (1979), *cert. denied,* 444 U.S. 1049 (1980) (defendant attempted to chloroform victim; struggle ensued; victim shot five times at close range).