Willie Lloyd TURNER, Appellant,

v.

Gary BASS, Superintendent, Appellee.

No. 84–4004.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 2, 1984.

Decided Jan. 25, 1985.

J. Lloyd Snook, III, Charlottesville, Va. (Paxson, Smith, Gilliam & Scott, Charlottesville, Va., on brief), for appellant.

Robert H. Anderson, III, Asst. Atty. Gen., Richmond, Va. (Gerald L. Baliles, Atty. Gen. of Va., Richmond, Va., on brief), for appellee.

Before WIDENER, HALL and PHILLIPS, Circuit Judges.

WIDENER, Circuit Judge:

In December 1979 Willie Lloyd Turner was tried by a jury in Northampton County, Virginia and found guilty of capital murder.[1] Pursuant to Va.Code § 19.2–264.4, the jury sentenced Turner to death. Turner unsuccessfully appealed his conviction and sentence to the Virginia Supreme Court. *Turner v. Commonwealth*, 221 Va. 513, 273 S.E.2d 36 (1980). The United

---

1. Turner was indicted in Southampton County, Virginia. A motion for a change of venue was granted and he was tried in Northampton County.

States Supreme Court denied Turner's petition for a writ of certiorari. 451 U.S. 1011, 101 S.Ct. 2347, 68 L.Ed.2d 863 (1981).

Turner then filed a petition for a writ of habeas corpus in the circuit court of Southampton County, Virginia. That petition was denied. The Virginia Supreme Court affirmed that denial. The United States Supreme Court once again denied Turner's petition for a writ of certiorari. 462 U.S. 1112, 103 S.Ct. 2465, 77 L.Ed.2d 1341 (1983).

Turner next sought relief in the federal courts. On July 27, 1983, he filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Virginia, raising numerous constitutional issues.[2] That petition was amended on March 20, 1984. The petition was initially denied on May 23, 1984, and a motion to alter or amend that judgment was denied July 19, 1984. The district court issued a certificate of probable cause, thus allowing Turner to appeal the denial of habeas corpus relief. This denial serves as the basis of the present appeal.[3] We affirm.

A brief summary of the facts leading to Turner's conviction are necessary for an understanding of the issues presented. On July 12, 1978, Turner entered Smith Jewelers in Franklin, Virginia, armed with a sawed-off shotgun, and demanded that the store owner W. Jack Smith give him money and jewelry. A store employee and a customer were also present in the store at the time. Another customer entered during the robbery. Smith set off the store's silent alarm, and momentarily police officer A.D. Bain arrived on the scene and inquired about the activation of the alarm. Bain's pistol was taken by Turner. Turner

then told Smith to turn the alarm off and keep filling bags with jewelry.

Turner soon became concerned that other police officers would respond to the alarm. He then fired a pistol shot into the back of the store. Officer Bain tried to assure Turner that no other policemen would be answering the alarm. Without any warning and with no provocation, Turner then shot store owner, Smith, in the head. The shot in the head did not kill Smith. It passed through his scalp, but apparently not through the skull. It caused bleeding on the coverings of the brain and bruised the brain's surface. Smith slumped and then fell helplessly to the floor. Officer Bain pleaded with Turner not to shoot anyone else, and offered to take Turner anywhere that he wanted to go. Turner then stated that he was "going to kill ... [Smith] for snitching on [him]." He then shot Smith, who was then still living, helpless and "gurgling," twice in the chest. One of these shots was in the lungs, one in the heart. Officer Bain was then able to disarm and subdue Turner. Smith died of the wounds in his chest.

## I

We turn now to the several issues raised on appeal. First, Turner contends that the district court erred in upholding the trial court's refusal to permit examination of the jury on voir dire concerning racial prejudice. He contends that because he is black and the murder victim was white the trial court should have questioned jurors about the existence of racial prejudice, and that his constitutional rights to a fair trial were violated by the court's refusal.[4]

A criminal defendant such as the defendant here has a constitutional right

---

2. Turner has exhausted his state remedies as required by *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982).

3. Turner's execution date was set for September 19, 1984. On August 28, 1984, this court entered· a stay pending further order of this court.

4. Turner's counsel requested that the jurors be asked the following:

The defendant, Willie Lloyd Turner, is a member of the Negro race. The victim, W. Jack Smith, Jr., was a white Caucasian. Will those facts prejudice you against Willie Lloyd Turner or affect your ability to render a fair and impartial verdict based solely on the evidence?

under the Sixth and Fourteenth Amendments to the Constitution to be tried by an impartial jury. *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). This does not entitle the defendant, however, to examine jurors on voir dire about every matter that may prejudice a juror against the defendant. But, where special circumstances exist, a criminal defendant may have a constitutional right to have veniremen questioned on racial prejudice. *Ristaino v. Ross*, 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976).

The Supreme Court found such special circumstances in *Ham v. South Carolina*, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973). Ham, a black man, was convicted in a South Carolina court of possession of marijuana. His defense at trial was that he was framed by law enforcement officials because of his civil rights activities. Ham was known throughout the community for his civil rights work. The trial court refused to question the jurors about possible racial prejudice against Ham. The Court found a due process violation in the trial court's failure to interrogate the jurors on the issue of racial bias.

Three years after its decision in *Ham*, the Supreme Court refused to create a per se rule requiring voir dire on racial prejudice in any case where the defendant is of a different race from the victim. *Ristaino v. Ross, supra.* Ross, a black male, was tried in a Massachusetts court for armed robbery, assault and battery with a dangerous weapon and assault and battery with the intent to commit murder. The victim was a white security guard. The Court rejected the court of appeals' decision that such voir dire should be required because the case involved a violent crime committed by a black against a white security guard. Such a holding, the Court said, interpreted *Ham* too broadly. *Ham* represented a fact specific situation in which racial issues were "inextricably bound up with the conduct of the trial." *Ristaino, supra,* 424 U.S. at 597, 96 S.Ct. at 1021. The Court concluded that the mere fact that the victim was white and the defendant was black was less likely to distort the trial than were the special factors present in *Ham.* "The circumstances did not suggest a significant likelihood that racial prejudice might infect Ross' trial." 424 U.S. at 598, 96 S.Ct. at 1022. Thus, voir dire on racial prejudice was not constitutionally mandated.

Turner contends that his case involves special circumstances requiring voir dire on racial prejudice because he is charged with capital murder and that in and of itself is a special circumstance. He also contends that defendants who murder whites are more likely to be sentenced to death and therefore a special circumstance is created by this likelihood.

We reject both contentions. There must exist some special circumstance in the facts surrounding a particular case before such voir dire is constitutionally required. We are of opinion that the nature of the crime or punishment itself is not a special circumstance. Nor is the fact that the victim is white and the defendant black, as *Ristaino* specifically so held. We are also of opinion that the fact that a larger percentage of white victims' assailants are executed than are other races is not a special circumstance. "There is no constitutional presumption of juror bias for or against members of any particular racial or ethnic groups." *Rosales-Lopez,* infra, 451 U.S. at 190, 101 S.Ct. at 1635.

An even more recent pronouncement from the Supreme Court involving a Mexican defendant confirms that "[o]nly when there are more substantial indications [than a victim of one race and the defendant of another or a defendant of any particular race] of the likelihood of racial or ethnic prejudice affecting the jurors in a particular case does the trial court's denial of a defendant's request to examine the juror's ability to deal impartially with the subject amount to an unconstitutional abuse of discretion." *Rosales-Lopez v. United States,* 451 U.S. 182, 190, 101 S.Ct. 1629, 1635, 68 L.Ed.2d 22 (1981).

The broad inquiry in each case must be "... whether under all of the circumstances presented there was a constitution-

ally significant likelihood that, absent questioning about racial prejudice, the jurors would not be 'indifferent as [they stand] unsworne.'" *Ristaino,* 424 U.S. at p. 596, 96 S.Ct. at p. 1021. An examination of all of the circumstances presented here does not indicate there was a constitutionally significant likelihood that absent questioning about racial prejudice the jurors would not be indifferent as they stood unsworn. As Turner concedes, there is nothing special in the facts surrounding this case to suggest racial antagonism. That being true, the trial court did not commit constitutional error by refusing to ask the jurors the question copied in footnote 4 in the margin.

## II

Turner next contends that the exclusion of juror Samuel Cypress for cause violated his Sixth and Fourteenth Amendment rights. Cypress was struck for cause over defense objections after the following colloquy:

Now, Mr. Cypress, do you have any religious or conscientious scruples or objections against the imposition of the death penalty?

Mr. Cypress: Well, really, I don't go for the death penalty.

The Court: Can you say yes or no to that question?

Mr. Cypress: No.

The Court: Or yes?

Mr. Cypress: Do I have any objection?

The Court: Yes.

Mr. Cypress: Yes.

The Court: Is your objection to the death penalty absolute?

Mr. Cypress: Well, I would say yes.

The Court: Could you in a proper case impose the death penalty?

Mr. Cypress: Didn't hear.

The Court: Could you in a proper case impose the death penalty?

Mr. Cypress: Well, I can't see where it helps any.

Turner argues that Cypress' responses do not show that he was irrevocably committed before trial to vote against the death penalty. In particular, Turner challenges the Virginia court's interpretation of Cypress' response that he did not see that it helped any when queried about whether he could impose the death penalty.

In *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and again in *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), the Court held that the State may strike for cause jurors whose opposition to the death penalty would prevent them from considering all the penalties provided by state law. That opposition must be such as to lead the juror to either ignore the law or violate his oath as a juror. The fact that a juror may be opposed to the death penalty does not provide grounds to strike him for cause as long as he could consider imposition of the death penalty in an appropriate case.

In this case, the state trial judge, after questioning Cypress and observing his demeanor, determined that cause existed to strike him from the jury panel. The district court refused to disturb the trial judge's findings, and we agree.

Under 28 U.S.C. § 2254(d), factual findings such as those of a state trial court[5] are presumed to be correct in a habeas corpus action in federal court unless, among other things not applicable here, those determinations are not fairly supported by the record. That standard applies to our consideration of Cypress' qualification to serve on the jury. In *Patton v. Yount,* —— U.S. ——, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984), a case involving the partiality of a juror, much the same question as that presented here, the Court decided that, on habeas corpus review, when the question was whether or not a juror could set aside an opinion, the presumption of § 2254(d) applied, and that "special def-

---

**5.** The trial court's finding was specifically affirmed by the Virginia Supreme Court. 273

S.E.2d at p. 43.

erence" should be given to the finding of the trial court. The Court held that the juror in question was properly seated despite some ambiguous answers, much as here. "Jurors thus cannot be expected invariably to express themselves carefully or even consistently. Every trial judge understands this, and under our system it is that judge who is best situated to determine competency to serve impartially." at ——, 104 S.Ct. at 2893.

The question we must address therefore is whether there is fair support in the record for the trial court's conclusion that Cypress' opposition to the death penalty was absolute. We hold that the record supports that conclusion. Cypress stated that he opposed imposition of the death penalty. Following further questioning, Cypress said that this opposition was absolute. While his response to the trial judge's last question may have been ambiguous, such ambiguity has been resolved by the trial judge whose "... resolution of such questions is entitled, even on direct appeal, to special deference." at ——, 104 S.Ct. at 2892. The trial judge asked the proper questions required by *Witherspoon* and *Adams*. He was in the best position to observe Cypress' demeanor and intonation during voir dire. We refuse to disturb his decision that Cypress' opposition to the death penalty was absolute.

■ We do not construe *Keeten v. Garrison*, 742 F.2d 129 (4th Cir., 1984), to require us to make a de novo review of Cypress' qualification to serve on the jury, as Turner argues. Rather, we think it is consistent with *Patton*. But, assuming arguendo Turner's construction of *Keeten*, our holding would be the same. The trial judge could have reasonably concluded, after considering Cypress' responses in toto that he could not consider imposition of the death penalty in the proper circumstance, and we think his finding is supported by the record.

### III

As Turner notes in his brief, this court's recent opinion in *Keeten* precludes his argument that his constitutional right to an impartial jury was violated because a death qualified jury is claimed to be biased in favor of the prosecution. *Keeten* was recently reaffirmed by this court in *Briley v. Booker*, (1984).

### IV

■ Turner claims error in the district court's denial of an evidentiary hearing on his claim that he was denied effective assistance of counsel at the penalty phase of his trial. He does not claim ineffective assistance at the stage of the trial ascertaining guilt or innocence. The district court found that Turner's trial was not a case in which counsel had failed to present any evidence, or only evidence of marginal value, and concluded that Turner's attorneys had presented evidence of his psychological history and mental state at the time of the murder, which are matters in mitigation specifically included in Virginia Code § 19.2–264.4. It concluded that counsel had complied with the standard set out in *Marzullo v. Maryland*, 561 F.2d 540 (4th Cir.1977), cert. den. 435 U.S. 1011, 98 S.Ct. 1885, 56 L.Ed.2d 394 (1978), and that no evidentiary hearing was required. We agree.

■ When a habeas petitioner presents facts which, if proved, would entitle him to habeas corpus relief, a federal court can receive that evidence at a hearing. *Townsend v. Sain*, 372 U.S. 293, 312, 83 S.Ct. 745, 756, 9 L.Ed.2d 770 (1963). An evidentiary hearing in a federal habeas corpus proceeding is required only if the habeas petitioner establishes one or more of the enumerated criteria of 28 U.S.C. § 2254(d) or in *Townsend*, supra, at 312–318, 83 S.Ct. at 756–759. *Shaw v. Martin*, 733 F.2d 304 (4th Cir.1984). Where a state court has decided the merits of a claim but made no express findings of fact, the district court may be able to reconstruct those findings without a hearing. Of course no hearing is required if the facts alleged by the petitioner and assumed to be true are insufficient to support a claim.

On appeal, Turner confines himself wholly to the defense attorneys' treatment of the psychological evidence at the penalty stage of the trial, if we include the side claim that the attorneys did not produce "the corroborating evidence necessary to make credible a psychological or mitigating defense." To place this contention in proper perspective, a brief review of the claim is in order. Following Turner's conviction, he employed other counsel to prosecute his appeal. These are the same attorneys who are presently in the case. They have represented Turner at least since May 1980, the date of filing of Turner's brief in the Supreme Court of Virginia in the appeal of the criminal conviction.

Following affirmance of Turner's conviction, he filed a petition for habeas corpus in the state court. So far as concerns us here, the only pertinent contention there made was that "counsel failed to develop and present adequately the psychiatric evidence sufficient to support a finding of the presence of mitigating mental abnormalities." That petition was dismissed and no written ·elucidation or explanation of the contention was ever brought to the attention of the trial court prior to its order of February 10, 1982 dismissing the petition. On April 6, 1982, however, Turner's attorneys filed a paper with the trial court giving their version of the statement of facts, including what took place at the hearing. The Commonwealth did likewise. On June 3, 1982, the trial judge signed a statement of facts which included the fact that at oral argument petitioner's attorneys had proffered that the defense attorneys had not consulted any psychiatrist other than Dr. Bransfield and that the defense attorneys had not adequately researched capital murder statutes in other jurisdictions regarding the definition and application of the mitigating factors set forth in Virginia Code § 19.2–264.4B. This latter finding, however, does not concern us here in view of the course the trial and this appeal have taken. The Virginia Supreme Court denied a petition for appeal from the trial court's dismissal of the habeas corpus petition on January 11, 1983. In that order it relied on McMann v. Richardson, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970), and Marzullo, supra. The Supreme Court of the United States denied certiorari. 462 U.S. 1112, 103 S.Ct. 2465, 77 L.Ed.2d 1341 (1983).

Next, Turner applied for federal habeas corpus relief in the district court in the Eastern District of Virginia in the case at hand. In his petition, the allegations quoted above from the petition in the state court were copied in haec verba. That petition was likewise dismissed. The first time that any mention was ever made in this case of any missing witness with respect to the sentencing phase of the case, or failure to consult another psychiatrist, or any other failure with respect to the treatment of the psychiatric evidence, was when a motion was made on July 2, 1984 to alter or amend the judgment of the district court. At that time it was claimed that the defense attorneys should have called Turner's younger sister, his uncle, and two people who would say that they were willing to back Turner in opening a barber shop after release from prison. Also, Turner then filed his affidavit seeking to explain the circumstances surrounding his earlier crimes, together with some documents corroborating some good incidents in his career while imprisoned.

"The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Strickland v. Washington, — U.S. —, —, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984). It is by that standard that Turner's attorneys are to be measured.

■ So, we examine the attorneys' actions with respect to the psychiatric testimony. To begin with, they moved the court that they be permitted to employ a private psychiatrist to examine Turner. The court instead appointed a certain Dr. W.F. Daughtrey, Jr., a general practitioner, to examine and evaluate Turner and to make a report in writing to the court and to the attorneys in accordance with then effective § 19.2–169 of the Code of Virginia.

Dr. Daughtrey reported that in his opinion Turner was mentally competent to stand trial. Being of opinion, however, that more extensive examination, evaluation and observation was desirable, the court then committed Turner to Central State Hospital, a mental hospital, for additional examination, evaluation and observation. The hospital was ordered to report to the court and to the attorneys, which it did. While there, Turner underwent psychiatric, psychological and sociological evaluation by the staff. The report from Central State Hospital was that Turner suffered from personality disorders and anti-social personality, each mild. It recommended that he be returned to the court for disposition of the pending charges. Turner's attorneys persisted, however, that Turner needed further examination, and the court ordered that the attorneys be permitted to employ Dr. Bransfield.[6] Dr. Bransfield, after examination of Turner and after psychological testing by Dr. Erwin F. Sacks, PhD and one of Dr. Bransfield's associates, submitted a long and detailed report to the effect that Turner was competent to stand trial. While Dr. Bransfield did not feel that Turner had schizophrenia, he was of opinion that a few psychiatrists would diagnose Turner as having latent schizophrenia. He also was of opinion that Turner in times of stress might display paranoid tendencies but that Turner had not shown a paranoid psychosis. He also thought that Turner had an anti-social personality and was not under an irresistible impulse at the time of the murder.

At the sentencing phase, Turner called one of the psychiatrists who had examined him, Dr. Bransfield, as well as his mother, his cousin and his aunt. He also called Officer Bain and the police chief. The officers were obviously called to prove that Turner was placed in a position of stress upon finding out that the silent alarm had been set off and upon the appearance of Officer Bain. The family witnesses, of course, had good things to say about Turner, how he was good to his family and had had a very disadvantaged childhood. His mother also testified, in corroboration of Dr. Bransfield, that at or about the time of the shooting she had had to call the local police about an incident at home and that she had told the police that Turner needed treatment for his mind. She said that he had been in a daze and that she was afraid that he might hurt somebody if they would push him. Dr. Bransfield had testified that if Turner believed he was cornered he might react in a violent way and he felt that if Turner had had treatment at the time of the shooting that Smith would not have been killed.

Dr. Bransfield, all in all, was quite a good witness for Turner. The gist of his testimony is contained in one of his answers on cross-examination:

"He had psychotic symptoms which were present for at least three weeks before July 12th [the day of the murder]. I could list what those symptoms are. They seemed to influence his behavior. I could not prove—there was no evidence that I could show that his shooting Mr. Smith was fully and completely a psychotic act; however, I do feel that he was affected by psychotic problems which impaired his ability to perform in a rational manner and the symptoms that he had, I could list."

Earlier, the conclusion of Dr. Bransfield's direct examination was as follows:

Q ... [D]o you have an opinion with reasonable medical certainty as to whether this crime was committed while Willie Turner was under the influence of extreme mental or emotional disturbance?

A Yes, I do have an opinion.

Q And what is that opinion, sir?

---

6. We note that the orders for the various psychiatric examinations of Turner were entered by the General District Court before Turner was indicted. In Virginia, the General District Court in the usual course of things has jurisdiction to ascertain probable cause and decide whether a defendant will be bound to a grand jury. Circuit Courts are the trial courts of general jurisdiction.

A That I feel he was under the influence of mental disturbance while he was committing the crime.

Thus, Dr. Bransfield's testimony tended to show one of the facts which may tend to show mitigation specifically mentioned in the Virginia statute, "the influence of extreme mental or emotional disturbance," and also touched upon another like statutory factor, "the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." See Va.Code § 19.2–264.4. In view of Dr. Bransfield's testimony, it is seen that the contention in both petitions for habeas corpus, that the attorneys "failed to develop and present adequately the psychiatric evidence sufficient to support a finding of the presence of mitigating mental abnormalities," is little better than frivolous. The evidence was there for the jury to consider. The jury simply chose not to found its verdict upon that mitigating circumstance.

The claim now made on appeal is that Turner's attorneys "mishandl[ed]" "the psychiatric testimony and mitigating evidence" which was "essentially a product of ignorance." The claim goes that the attorneys "did not know the diagnostic implications or the potential dangers from cross examination of a diagnosis of anti-social personality;" they "had not discussed with Dr. Bransfield the definitions of the mitigating and aggravating circumstances on which he would be expected to comment;" and "did not acquire the degree of expertise in psychiatric matters necessary to fully develop the psychiatric defense."

The record belies the charges. The attorneys had caused three examinations of Turner, the preliminary examination by a general practitioner and two by psychiatric experts. While we are not told what are the diagnostic implications or potential dangers from cross examination of a diagnosis of an anti-social personality, the attorneys were obviously prepared to have more than one psychiatrist testify, for they so advised the court in the record. Dr. Bransfield's testimony was as good as it could have been. We think Turner's attorneys, in handling the psychiatric defense, did a professional job in every sense of the word. They had a good witness who testified as favorably in Turner's behalf as could have been wanted. Their examination of the witness was conducted in a skillful and knowledgeable manner. We are thus of opinion that their performance in Turner's behalf was reasonable under prevailing professional norms. Turner's present reliance on other possible theories of defense are nothing more than afterthoughts, we think, brought into play after the best defense, that of direct evidence on the direct question involved, had been tried but found wanting through no fault of the attorneys. The question of Turner's state of mind and the degree of his responsibility for his acts at the time of the shooting was purely a jury question. By its verdict the jury simply found that the mitigating factors were insufficient, a matter entirely within its province. No fault of any kind can be laid to the attorneys for this result.[7]

### V

Turner challenges the use of the vileness criterion in this case as being violative of his rights under the Eighth and Fourteenth Amendments to the Constitution.

Under Virginia law the death penalty may be imposed upon a defendant if the jury finds beyond a reasonable doubt that "there is a probability based upon evidence of the prior history of the defendant or of the circumstances surrounding the commission of the offense of which he is accused that he would commit criminal acts of violence that would constitute a continuing serious threat to society; [the dangerousness criterion] *or* that his conduct in committing the offense was outrageously or wantonly vile, horrible, or inhuman, in that it involved torture, depravity of mind or

---

7. With respect to the claim that the attorneys should have shopped around for another psychiatrist, we have excluded that ground in *Barfield*
*v. Harris,* 719 F.2d 58, 63 (4th Cir.1983), affirming 540 F.Supp. 451 (E.D.N.C.1982), and we do not think the claim has any validity here.

aggravated battery to the victim" (the vileness criterion) Va.Code § 19.2–264.4C (emphasis added).

The Virginia Supreme Court has construed the vileness component of § 19.2–264.4C to include three separate and distinct features, those being torture, depravity of mind or aggravated battery. Proof of only one of these factors is sufficient to support a sentence of death. *Bunch v. Commonwealth*, 225 Va. 423, 432, 304 S.E.2d 271 (1983). Even more importantly, the Virginia Court has also given a limiting construction to two components of the vileness criterion. Depravity of mind has been construed to mean "a degree of moral turpitude and physical debasement surpassing that inherent in the definition of ordinary legal malice and premeditation." Aggravated battery is "a battery which qualitatively and quantitatively is more culpable than the minimum necessary to accomplish an act of murder." *Smith v. Commonwealth*, 219 Va. 455, 248 S.E.2d 135, 149 (1978).

■■ The jury here was given a verdict form setting out both statutory aggravating factors (dangerousness and vileness) connected by the conjunctive "and/or". The jury unanimously imposed a sentence of death,[8] returning the verdict form without striking either the "and" or the "or".[9] Thus, this case differs from *Briley v. Bass*, 742 F.2d 155 (4th Cir.1984), where the jury struck the word "or" and unanimously found both aggravating factors. There, the court did not need to consider a similar constitutional attack on the vileness criterion of § 19.2–264.4C because the dangerousness criterion was sufficient. *Briley* at pp. 165–166. Because we cannot be sure which factor the jury relied upon in awarding the death sentence in this case, we consider Turner's attacks on the vileness criterion.[10]

■■ Turner does not attack the constitutionality of this aggravating factor on its face, as that issue has been disposed of in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Instead, he attacks its constitutionality as applied to him, relying upon *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (plurality opinion).

In *Godfrey* the Supreme Court reversed the imposition of the death penalty in a capital murder case because the Georgia vileness criterion was unconstitutionally applied to the defendant. Godfrey had been having marital problems with his wife of 28 years. He had a history of a drinking problem and violent behavior toward his wife. Godfrey's wife had left him and had filed suit for divorce. His attempts at reconciliation were rebuffed. Mrs. Godfrey moved in with her mother, who Godfrey felt encouraged the separation.

One evening immediately after arguing with his wife over the telephone, Godfrey took his shotgun and walked a short way to his mother-in-law's home. He peered through the window and saw his wife, his 11 year old daughter, and his mother-in-law. He immediately shot his wife in the forehead, killing her instantly. He then entered the trailer and struck and injured his daughter. He then fired one shot at his

---

**8.** The jury verdict read as follows:
"We, the Jury, on the issue joined, having found the defendant guilty of Capital Murder of W. Jack Smith, Jr., as charged in the Indictment, and having found that,
after consideration of his past criminal record that there is a probability that he would commit criminal acts of violence that would constitute a continuing serious threat to society,
and/or
his conduct in committing the offense is outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind; aggravated battery to the victim beyond the minimum necessary to accomplish the act of murder,

and having considered the evidence in mitigation of the offense, unanimously fix his punishment at death."

**9.** We agree with the Virginia Supreme Court that the better practice would be for the trial court to poll the jury as to which aggravating factor they found. *Turner*, supra, 273 S.E.2d at 45 n. 12.

**10.** Turner does not challenge the dangerousness criterion. There is ample evidence in the record to support such a verdict. *Turner*, supra, 273 S.E.2d at 44 n. 11 and 273 S.E.2d at 45.

mother-in-law, hitting her in the head and killing her instantly. Godfrey immediately called the police, surrendered and confessed to the murders. 446 U.S. 424–426, 100 S.Ct. 1763–1764.

Godfrey was found guilty of two counts of murder and one count of aggravated assault. He was sentenced to death under Georgia's statute providing as aggravating circumstances that the offense was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." [11] At the sentencing stage of trial, the prosecutor conceded that the case did not involve torture or aggravated battery. The jury found that "the offense of murder was outrageously or wantonly vile, horrible or inhuman." The Georgia Supreme Court affirmed the imposition of the death penalty.

The Supreme Court reversed. The Court first noted that a State's sentencing scheme must provide "a meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." Id. at 427, 100 S.Ct. at 1764, quoting *Furman v. Georgia*, 408 U.S. 238, 313, 92 S.Ct. 2726, 2764, 33 L.Ed.2d 346 (White, J. concurring). The sentencer must be given clear and objective standards to follow in the application of the death penalty. Those "specific and detailed" guidelines enable the courts to rationally review the sentence imposed.

The Court found no such guidance present in *Godfrey*. Nothing in the words "outrageously or wantonly vile, horrible or inhuman" alone distinguished this murder from others not eligible for the death penalty. The Court reached this conclusion after reviewing Georgia case law giving the phrase a limited construction that required a demonstration that the offense involved torture, depravity of mind or aggravated battery. Depravity of mind had been defined in Georgia to mean the state of mind leading to torture or aggravated battery. But in Godfrey's case the prosecution had conceded that no torture or ag-

gravated battery was present. Thus, the murders did not fit within the limiting criteria set out by the Georgia Supreme Court.

The Court held in *Godfrey* that the phrase "outrageously or wantonly vile, horrible or inhuman" in and of itself had not been given a constitutional construction by the Georgia Supreme Court. The Court concluded that "[t]he petitioner's crimes cannot be said to have reflected a consciousness materially more 'depraved' than that of any person guilty of murder. His victims were killed instantaneously. They were members of his family who were causing him extreme emotional trauma. Shortly after the killings, he acknowledged his responsibility and the heinous nature of his crimes." Id. 446 U.S. at 433, 100 S.Ct. at 1767.

On direct appeal, the Virginia Supreme Court rejected Turner's argument that *Godfrey* required reversal of his death sentence. It construed the statute to require not only outrageously or wantonly vile, horrible or inhuman conduct, but also that such conduct involve either torture, an aggravated battery of the victim, or the perpetrator's depravity of mind. The Court then found, applying its limiting precedent of *Smith v. Commonwealth*, that the evidence established an aggravated battery which is a " 'battery which, qualitatively and quantitatively, is more culpable than the minimum necessary to accomplish the act of murder.' " 248 S.E.2d at 149; 273 S.E.2d at 45. The court then found that, in all events, the dangerousness criterion of the statute had been met. Turner had been convicted previously of malicious maiming, escape, unlawful wounding, malicious wounding, and second degree murder, four of the offenses occurring while he was in prison. The validity of this finding is not questioned on appeal.

We agree with the analysis by the Virginia Supreme Court. The fatal weakness in *Godfrey* was the unconstitutionally broad construction given the vileness criterion in the absence of both torture and

---

**11.** This language is identical to that of Va.Code § 19.2–264.4C.

aggravated battery by the Georgia Supreme Court. That weakness is not present here. The Virginia Supreme Court has given a limited construction to the vileness criterion and applied that limited construction here.

We also note that the facts of this case are not even similar facts to those upon which the Supreme Court relied in *Godfrey*. In contrast, the murder here was cold-blooded and calculated, involving no element of emotional trauma as was present in *Godfrey*. Turner initially shot Smith for no reason at all. While Smith lay alive but helpless and while Officer Bain pleaded, Turner fired two shots into Smith's chest after stating that he was going to kill him for snitching on him. No comparison can be drawn between the facts of *Godfrey* and the deliberate malicious murder presented in this case. We reject Turner's contention that his crime was not so vile as to justify the imposition of death. The case fits within the constitutionally limited construction of the vileness criterion established by the Virginia Supreme Court, and we are of opinion Virginia's death penalty provisions were constitutionally applied.

■■ On a related subject, we find no constitutional deficiency in the instructions given to the jury at the sentencing stage of the trial. The instructions set out the appropriate mitigating factors of § 19.2–264.-4, and the jury was also instructed as to the limiting definition of aggravated battery as expressed in *Smith*. The trial judge carefully instructed the jury that "[w]here the evidence is susceptible to two interpretations, one consistent with the imposition of the death penalty, and the other with the imposition of life imprisonment, you should not adopt that interpretation which is consistent with imposition of the

death penalty." We do not think that *Godfrey* requires that a jury be instructed on each term in the aggravating circumstances. We see no reason why this jury should not have understood the terms of the instructions given. *Cape v. Francis*, 741 F.2d 1287 (11th Cir.1984).

The constitutional flaw of *Godfrey*, the Georgia Court's failure to give a constitutional construction to the vileness criterion, is not present here. The Virginia Court has limited the breadth of the criterion in such a manner that its application here was neither arbitrary nor capricious.[12] The jury was properly instructed. Nothing else was constitutionally required.

## VI

■■ While deliberating on the sentence to be imposed, the jury returned and asked the judge what life imprisonment entailed. The judge responded that the jury must consider only the two alternatives set out in the instructions, those being death or life imprisonment.

Turner contends that the due process requires that the jury be instructed that a prisoner may be entitled to parole and that the parole board is permitted to grant parole only after finding that the prisoner's release will serve his interests and the interests of society.

It is settled that such an instruction is not permissible under Virginia law. *Clark v. Commonwealth*, supra; *Hinton v. Commonwealth*, 219 Va. 492, 247 S.E.2d 704 (1978).

In *California v. Ramos*, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), the Court upheld as constitutional a California law requiring that a jury in a capital case be instructed of the governor's power to commute a sentence of life without the

---

**12.** The Virginia Supreme Court has consistently applied the limiting provisions of *Smith v. Commonwealth*, supra, in its review of cases involving the death penalty. *Stockton v. Commonwealth*, 227 Va. 124, 314 S.E.2d 371 (1984) (aggravated battery and depravity of mind); *Bunch v. Commonwealth*, 225 Va. 423, 304 S.E.2d 271 (1983) (aggravated battery and depravity of

mind); *Whitley v. Commonwealth*, 223 Va. 66, 286 S.E.2d 162 (1982) (aggravated battery); *(James) Briley v. Commonwealth*, 221 Va. 563, 273 S.E.2d 57 (1980) (aggravated battery and depravity of mind); *Clark v. Commonwealth*, 220 Va. 201, 257 S.E.2d 784 (1979) (depravity of mind).

possibility of parole. The Court made clear that while such disclosure is constitutionally permissible it is not constitutionally required. It also upheld the failure or refusal of the trial court to instruct the jury on the governor's power to commute a death sentence. In arriving at its decision, the Court noted: "[o]ur conclusion is not intended to override the contrary judgment of state legislatures that capital sentencing juries in their state should not be permitted to consider the governor's power to commute a sentence.[30]" In footnote 30 the Court stated that "[m]any state courts have held it improper for the jury to consider or to be informed—through argument or instruction—of the possibility of commutation, pardon or parole." Id. at ——, 103 S.Ct. at 3459. While not exactly on point, we think *Ramos* indicates that the Court would decide that while it is constitutionally permissible to instruct the jury on the subject of parole, such an instruction is not constitutionally required. We so hold. Accord *O'Bryan v. Estelle,* 714 F.2d 365, esp. 389 (5th Cir.1983).

We have considered each of the issues raised by Turner in his appeal and find that he had a constitutionally fair trial.

Our stay of the state court's order to impose its sentence is hereby dissolved.

The judgment of the district court is AFFIRMED.

JAMES DICKSON PHILLIPS, Circuit Judge, specially concurring:

I concur in the judgment and in all of the opinion except that part dealing with the claim of due process denial in refusing to question prospective jurors about the possibility of racial bias. On that point I believe the majority opinion puts too restrictive a reading on the circumstances that may entitle a criminal defendant, as a matter of due process, to have prospective jurors so questioned. But because I further believe that the circumstances giving rise to the right were not demonstrated here under a proper application of the principle, I concur in the court's conclusion that no due process denial was established.

As I read *Rosales-Lopez v. United States,* 451 U.S. 182, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981); *Ristaino v. Ross,* 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976); and *Ham v. South Carolina,* 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973), in conjunction, they yield the following principles.

The fact alone that defendant is of a different race than the crime victim is not a circumstance giving rise to the due process right, *Ristaino,* 424 U.S. at 596, 597, 96 S.Ct. at 1021, 1022; nor is this altered by the nature of the crime charged or the punishment possible, *see Ristaino,* 424 U.S. at 596 n. 8, 96 S.Ct. at 1021 n. 8 (generally rejecting *per se* approach based upon non-case-specific factors such as violent nature of crime). But special circumstances giving rise to the right may be present in a case in which racial issues are "inextricably bound up with the conduct of the trial." *Id.* at 597, 96 S.Ct. at 1021 (so interpreting basis of right recognized in *Ham* where racial prejudice against defendant was raised as defense on the merits). And, aside from specific trial issues, "more substantial indications [than race differences alone] of the likelihood of racial or ethnic prejudice affecting the jurors in a particular case" may trigger the right. *Rosales-Lopez,* 451 U.S. at 190, 101 S.Ct. at 1635 (dicta: constitutional test stated in applying broader supervisory rule for federal courts); *see also Ristaino,* 424 U.S. at 598, 96 S.Ct. at 1022 (constitutional right might arise not only from specific trial issues but from "racial factors ... of comparable significance").

But as I read the majority opinion, it reads these decisions more restrictively in holding that only "special circumstances in the facts surrounding a particular trial" invoke the constitutional right, and that "the fact that a larger percentage of white victims' assailants are executed" may not be such a special circumstance. If by this the majority is saying that only when *Ham*-type racial issues are bound up in the merits of a criminal trial can the due pro-

cess right arise, I cannot agree. Obviously, if this were correct, it would follow that factors related solely to likely juror attitudes independent of specific issues in a particular case—including statistical demonstrations of jury propensities—would always be irrelevant.

But, as indicated, I do not read the authoritative Supreme Court decisions to limit the right to *Ham*-type situations. I believe that not only specific racial issues in the particular case but a demonstrated likelihood of racial prejudice affecting the "particular" jury, irrespective of specific issues, may invoke the constitutional right. And I would not be prepared flatly to rule out as possible means, among others, of demonstrating such a likelihood scientifically sound statistical evidence related to community attitudes as reflected in jury performance in sufficient samples of comparable cases.

But to demonstrate that such a propensity was sufficiently likely to afflict the "particular" jury in a given case, I think the evidence offered—whatever its source and content—would have to be much more focussed in time and geographical terms upon the very community from which the particular jury venire is drawn than was the evidence here advanced by Turner. That evidence consisted only of the following:

(1) A study by Bowers and Pierce of post-*Furman v. Georgia* data collected through December 1977 from Georgia, Florida, Texas, Alabama and Ohio, which revealed that 14.59% of blacks killing whites received the death penalty, compared to 2.66% of whites killing whites, 0.54% of blacks killing blacks, and 0.50% of whites killing blacks;

(2) a 1983 study by Gross and Mauro of data through 1980 from Oklahoma, North Carolina, Mississippi, Virginia and Arkansas. The Virginia data focused on 19 cases out of 1389 criminal homicides, these cases being chosen to control for attitudes about the degree of atrocity involved in the homicide. The statistical analysis of Virginia data showed 8.2% of

blacks killing whites receiving the death sentence compared to 1.3% of the whites killing whites and 0.60% of blacks killing blacks. No white had received the death penalty for killing a black under Virginia's 1977 capital punishment statute.

This evidence, whatever its general statistical reliability as a measure of community attitudes over the wide expanses of area and time covered, is simply too diffused in its depiction of likely community, hence juror, attitudes in this particular case to invoke the right. But I am not prepared to hold, as I think the majority opinion implies, that the requisite likelihood, hence the due process right, can never be shown by statistically sound evidence of particular community attitudes as reflected in sufficiently contemporary jury verdicts in comparable situations.